Robert L. Brace, CSBN 122240
Maria F. Elosu, CSBN 342086
1807 Santa Barbara Street
Santa Barbara, CA 93101
Telephone: (805) 886-8458
rlbrace@rusty.lawyer
mariaelosulaw@gmail.com

Michael P. Denver, CSBN 199279
DENVER LAW, P.C.
514 W. Pueblo St., Suite 101
Santa Barbara, CA 93105
Telephone: (805) 896-4967
mdenver@denverlawgroup.law

Patrick Bageant, CSBN 275135
HOLLYSTONE LAW
1775 W. State Street, No. 286
Boise, ID 83702
Telephone: (208) 596-5343
pbageant@hollystonelaw.com

*Attorneys for Plaintiffs and all others similarly situated.*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERT HENNY, an individual; JASKGOLF, LLC, an Illinois limited liability company; JEFF ASK, an individual; JAMES RYLEY, an individual; and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY NATIONAL BANK, a national banking association and RBC Company,<br><br>Defendant. | Case No.: 8:26-cv-1797<br><br>**CLASS ACTION COMPLAINT FOR AIDING AND ABETTING FRAUD, AIDING AND ABETTING FRAUDULENT CONCEALMENT, AND VIOLATION OF CALIFORNIA PENAL CODE § 496**<br><br>**JURY TRIAL DEMANDED** |

CONTENTS


I. INTRODUCTION .......... 1

II. JURISDICTION AND VENUE .......... 6

III. PARTIES .......... 7

IV. RELEVANT NON-PARTIES .......... 8

V. AGENCY AND INTERMEDIARY ALLEGATIONS .......... 11

VI. INFORMATION ALLEGATIONS .......... 12

VII. DELAYED DISCOVERY OF CNB'S ROLE .......... 13

VIII. FACTUAL ALLEGATIONS .......... 23

A. Horwitz and 1inMM Operated a Ponzi Scheme. .......... 23

B. Plaintiffs and the Class Invested in the Scheme. .......... 25

C. CNB Had Repeated Points of Visibility into the Scheme .......... 26

1. CNB Conducted Enhanced Due Diligence over 1inMM Capital Because It Was an NAICS 525990 Entity. .......... 26

2. CNB's Entertainment-Industry Expertise Made Horwitz's Story Inconsistent with Legitimate Film-Finance Activity by October 2017. .......... 28

3. CNB's Own Transaction Detail Reports Documented the Movie Fraud. .......... 29

4. CNB's Hundreds of Wire Reviews Repeatedly Exposed the Same Fraudulent Account Activity. .......... 33

5. CNB's Mandatory Overdraft Reviews Required Repeated Account-Level Scrutiny. .......... 33

D. CNB's LOC Lending and Repayment Records Showed Knowledge of the Scheme .......... 36

1. CNB Extended and Renewed Credit to Horwitz. .......... 37

2. Horwitz Used the LOC as a De Facto Cash-Management Account .......... 37

3. The LOC Was Not Used for Personal Expenses. .......... 41

4. CNB's Loan Proceeds Were Used to Make Investor-Related Payments. 42

5. CNB Was Repaid With Investor Money. 43

6. The Circular Flow of Funds Made the Scheme Apparent. 44

7. These LOC Facts Support Actual Knowledge No Later Than October 2017. 45

E. The October 2017 JJMT Investigation Gave CNB Actual Knowledge of the Ponzi Scheme. 46

F. Additional Facts Support the Inference That CNB Knew the Details of the Scheme Before October 2017. 50

G. After October 2017, CNB Substantially Assisted the Scheme. 53

1. CNB Maintained the Accounts and Continued Processing Investor-Related Transactions. 54

2. CNB Continued Extending Credit and Tolerating Overdrafts. 54

3. CNB Issued a Misleading Proof-of-Funds Letter. 55

4. CNB Assisted Late-Stage Transfers as the Scheme Collapsed. 56

H. CNB's Later Conduct Corroborates Its Knowledge and Volition. 57

IX. CLASS ACTION ALLEGATIONS 59

A. Class Definition. 59

B. Numerosity. 60

C. Commonality and Predominance. 61

D. Typicality. 63

E. Adequacy. 64

F. Superiority and Manageability. 65

X. CLAIMS FOR RELIEF 66

A. Aiding and Abetting Fraud. 67

B. Aiding and Abetting the Fraudulent Concealment of a Material Fact. 70

C. Violation of California Penal Code § 496. .......... 74

XI. PRAYER FOR RELIEF .......... 77

XII. JURY DEMAND .......... 78

XIII. INDEX OF EXHIBITS .......... *a*

## I. INTRODUCTION

1. This is a class action brought by Net Loser investors against City National Bank ("CNB") for knowingly assisting Zachary Horwitz and 1inMM Capital in the operation and continuation of a Ponzi scheme, and for CNB's receipt, concealment, withholding, or assistance in concealing or withholding investor money obtained by fraud after CNB knew the money had been fraudulently obtained.

2. By no later than October 2017, CNB knew that Horwitz and 1inMM Capital were using CNB accounts to defraud investors. Despite that knowledge, CNB continued providing the accounts, wire services, credit facilities, overdraft accommodations, and other banking services that enabled the scheme to continue. As a result, Horwitz was able to raise additional investor funds after October 2017 and cause substantial losses to the Net Loser investors whom Plaintiffs seek to represent.

3. From approximately 2013 through 2019, Horwitz solicited and obtained investor funds through the 1inMM enterprise as part of a classic Ponzi scheme. The scheme then continued through late-stage account activity, lulling, recycling, and dissipation of investor funds before collapsing in April 2021. He and his agents represented that 1inMM Capital used investor funds to acquire film-distribution rights from filmmakers or rights owners and then resold or licensed those rights at a profit to major entertainment companies, including HBO, Netflix, and Sony. That represented business model did not exist.

4. The account activity told a different story. CNB's records reflected no purchases of film-distribution rights, no revenue from HBO, Netflix, Sony, or any similar counterparty, and no operating activity consistent with a legitimate feature-film finance business. Instead, the

accounts showed investor money flowing into the enterprise and then back out to earlier investors, aggregators, commission recipients, Horwitz, related parties, and CNB itself.

5. During the life of the scheme, approximately $710 million was deposited into 1inMM Capital accounts at CNB. (*See* Exh. 4.) At least $690 million of those deposits came through five principal sales agents or aggregators—JJMT Capital, Movie Fund, SAC-related entities, Vausse Films, and Pure Health. JJMT alone accounted for approximately $490 million transmitted into the 1inMM enterprise. (*See* Exh. 2 (Declaration of Lorraine Pearson) at ¶¶ 15–18.)

6. CNB was uniquely positioned to observe the fraud. It maintained the 1inMM Capital accounts, Horwitz's personal account, the 1inMM Productions account, and Horwitz's line-of-credit account. Through transaction monitoring, wire reviews, overdraft and NSF reviews, entertainment-banking relationship management, and lending reviews, CNB repeatedly examined the very account activity that revealed the scheme. CNB knew the terms of the fraudulent investments being sold because Horwitz disclosed the represented terms of the scheme during the October 2017 investigation.

7. CNB also possessed specialized entertainment-industry knowledge that helped it understand the scheme operating through the bank. CNB marketed itself as Hollywood's bank and assigned senior entertainment-banking personnel to serve Horwitz and the 1inMM entities. As a result, CNB understood what legitimate film-finance activity would look like, including payments for film rights, licensing revenue, royalty streams, and transactions with major industry counterparties. The Horwitz and 1inMM accounts reflected none of that activity, and CNB knew that because it repeatedly reviewed the accounts.

8. In addition to serving as depository bank, CNB was Horwitz's lender. Beginning in 2013, CNB extended a revolving line of credit with a maximum available balance of approximately $1.14 million. Over the life of the scheme, CNB advanced approximately $64 million to Horwitz through that facility. (*See* Exhs. 8, 9.)

9. CNB's lending records reinforced what its deposit records already showed. Loan proceeds moved from the line of credit into Horwitz's personal account, then into 1inMM-related accounts, and ultimately to investors and investor-related recipients. New investor money then flowed back through the same accounts to repay CNB. Rather than funding ordinary personal expenses, CNB's credit was used to sustain the enterprise's cash needs, and CNB was repaid with investor funds. (*See* Exhs. 5, 6, 8, 9.)

10. By October 2017, CNB had accumulated years of information concerning the 1inMM enterprise. That information culminated in CNB's investigation of large, round-number, circular transfers between 1inMM Capital account #0290 and JJMT's account at Chase Bank. CNB focused on September 2017 activity in which 1inMM received nineteen incoming wires from JJMT totaling approximately $16.18 million and 1inMM Capital sent twelve outgoing wires back to JJMT totaling approximately $10.67 million. (*See* Exh. 3 (CNB's business records of credits and debits reviewed as part of the investigation).)

11. Based on those records, CNB asked Horwitz to explain why the circular transactions occurred when a single net transfer could have reconciled the flows. On October 24, 2017, Horwitz represented to CNB that the credits in the account came from JJMT lending money to 1inMM Capital to acquire film-distribution rights. After using the funds to buy the film-distribution rights, 1inMM would license those same rights to Netflix, HBO, Sony, and similar counterparties. Horwitz claimed the outgoing wires back to JJMT were repayments by

the borrower, 1inMM Capital, to the lenders, the investors, after the supposed transactions with HBO, Netflix, and Sony were funded.

12. CNB's own records contradicted Horwitz's explanation. The accounts reflected no purchases of film rights from movie producers, no revenue from HBO, Netflix, Sony, or any other legitimate industry counterparty, and no operating activity consistent with a functioning film-rights business. Instead, the credits and debits reflected investor deposits and recycled payments back to JJMT, as an aggregator, for payment to individual investors, including the named Plaintiffs. (*See* Exhs. 1, 3.)

13. The October 2017 investigation of 1inMM Capital, JJMT, and Horwitz gave CNB actual knowledge of the nature of the enterprise. This case is not based on generalized red flags, Bank Secrecy Act obligations owed only to the government and not to non-customers, or a theory that CNB merely should have known something was wrong. CNB investigated the very transactions at issue in the case, received Horwitz's explanation, and possessed records demonstrating that the explanation was false. Plaintiffs and other investors did not have access to the data contained in Exhibit 3. No later than October 24, 2017, CNB had actual knowledge that Horwitz was running a Ponzi scheme, and the bank knew the terms of the fraud because Horwitz had explained them.

14. October 2017 is the latest date by which CNB acquired actual knowledge of the fraud. Earlier account activity, lending records, overdraft reviews, wire reviews, and due-diligence materials support the reasonable inference that CNB knew sooner. Plaintiffs need not establish earlier knowledge, however, because CNB's liability arises from the assistance it provided after acquiring actual knowledge.

15. Despite that knowledge, CNB did not close the accounts, terminate the banking relationship, reject unusual transactions, or take steps that would have exposed the fraud. Instead, CNB continued maintaining the accounts, processing investor-related wires, extending and renewing credit, accommodating overdrafts, issuing a misleading proof-of-funds letter, and assisting late-stage transfers as the scheme came under increasing financial pressure. (*See* Exhs. 1, 8, 10.)

16. CNB's assistance was substantial. A Ponzi scheme survives only so long as it can obtain new money and continue making payments to existing investors. By continuing to provide accounts, wire services, credit, overdraft accommodations, and other banking services after acquiring actual knowledge of the fraud, CNB supplied the financial infrastructure necessary to keep the scheme operating. Following October 2017, Horwitz and 1inMM raised hundreds of millions of additional dollars from investors and caused most of the Net Losers' damages. (*See* Exhs. 2, 4.)

17. Plaintiffs learned in 2021 that Horwitz had defrauded investors. They did not, however, know the bank-specific facts showing CNB's own actionable conduct—namely, CNB's actual knowledge of the fraud, its substantial assistance in perpetuating it, and its receipt, retention, concealment, withholding, or assistance in concealing or withholding investor money after knowing that the money had been obtained by fraud. Those facts were not disclosed in public criminal proceedings, generalized red-flag litigation, or publicly available receivership materials. They first became public in a form sufficient to alert Plaintiffs to CNB's potential liability when Michele Vives, the Receiver, filed her complaint against CNB on February 16, 2024. Receiver Vives's complaint is attached as Exhibit 1.

18. Plaintiffs bring this action on behalf of themselves and all similarly situated Net Losers whose losses were caused by CNB's knowing assistance after it acquired actual knowledge of the fraud and by CNB's receipt, retention, concealment, withholding, or assistance in concealing or withholding investor money after knowing that the money had been obtained by fraud. Plaintiffs seek classwide relief for aiding and abetting fraud, aiding and abetting fraudulent concealment, and violation of California Penal Code § 496, including compensatory damages, treble damages where permitted by law, punitive damages, interest, costs, attorneys' fees, and all other relief permitted by law.

## II. JURISDICTION AND VENUE

19. This Court has subject-matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), 1453. Minimal diversity exists because at least one proposed Class Member is a citizen of a state different from CNB. The proposed Class consists of more than 100 members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

20. This Court has personal jurisdiction over CNB because CNB is headquartered in Los Angeles, California, conducts substantial banking operations throughout California, and engaged in the conduct alleged in this Complaint through its California-based banking activities.

21. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in this District. Those events include banking activities conducted through CNB's Beverly Hills branch, located at 400 North Roxbury Drive, Beverly Hills, California.

## III. PARTIES

22. Plaintiff **Robert Henny** is an individual residing in Orange County, California. Henny invested in the 1inMM enterprise and suffered substantial net losses. He is a Net Loser and brings this action on behalf of himself and all similarly situated Class Members. Henny's net losses are set out in the schedule attached as Exhibit 14, which includes the names of the movies he believed he was investing in.

23. Henny invested in reliance on the uniformly represented 1inMM business model—that 1inMM Capital would acquire film-distribution rights from movie producers and generate investor returns through legitimate resale of those rights to HBO, Netflix, and Sony. Henny's reliance on the false statements, and on the absence of facts necessary to reveal that those statements were false, was reasonable. The other named Plaintiffs' reliance was also reasonable, as was the reliance of each Class Member.

24. **JASKGOLF, LLC ("JAG")** is an Illinois limited liability company. JAG invested in the 1inMM enterprise and suffered net losses. JAG assigned its rights to bring this action to **Jeff Ask**. JAG is named as a plaintiff only in the alternative and to the extent necessary to preserve or assert any claims that are determined not to have been assigned to Ask. Ask brings the assigned claims as assignee on behalf of all similarly situated Class Members.

25. Plaintiff **Jeff Ask** resides in Illinois. He made investment-related decisions for JAG, invested personally in the 1inMM enterprise, and suffered net losses. Ask brings this action on behalf of himself, as assignee of JAG's rights, and on behalf of all similarly situated Class Members, including assignees.

26. JAG and Ask invested through Ingen Funding I, LLC, a Colorado entity that acted as a sub-feeder to JJMT Capital. JJMT collected their investment funds and transmitted those funds to 1inMM Capital account (#0290) at CNB.

27. Together, JAG and Ask invested approximately $791,000 in the 1inMM enterprise, received approximately $189,000 in purported investment payments, and sustained a combined net loss of approximately $602,000.

28. Plaintiff **James Ryley** is an individual residing in Los Angeles, California. Ryley invested in the 1inMM enterprise and suffered net losses. He is a Net Loser and brings this action on behalf of himself and all similarly situated Class Members.

29. Unless otherwise stated, Henny, JAG, Ask, Ryley, and the putative Class Members are collectively referred to as "Plaintiffs." Plaintiffs' investments were deposited into, routed through, or are traceable to the Horwitz and 1inMM Capital accounts maintained at CNB.

30. Defendant **City National Bank ("CNB")** is an insured depository institution within the meaning of 12 U.S.C. § 1813(c)(2) and a national banking association within the meaning of 12 U.S.C. § 1813(q)(1)(A). CNB is chartered and regulated by the Office of the Comptroller of the Currency and is a subsidiary of Royal Bank of Canada. CNB's main office is in Los Angeles and, for diversity-jurisdiction purposes, City National Bank is a citizen of California.

## IV. RELEVANT NON-PARTIES

31. **Zachary Horwitz** operated 1inMM Capital, LLC, 1inMM Productions, LLC, and related entities. Through those entities, Horwitz solicited investor funds for a purported film-distribution-rights business. He has admitted that this conduct was fraudulent.

32. **1inMM Capital, LLC**, **1inMM Productions, LLC**, and other Horwitz-controlled entities are collectively referred to as the "1inMM Entities."

33. The principal CNB accounts used in the scheme included, as reflected in Exhibit 2:

a. 1inMM Capital, LLC account No. 0290;

b. 1inMM Capital, LLC account No. 2944;

c. Zachary Horwitz's personal account No. 5270;

d. 1inMM Productions, LLC account No. 1130; and

e. Zachary Horwitz's line-of-credit account No. 9641.

34. **Michele Vives** is the permanent receiver appointed in *Securities and Exchange Commission v. Horwitz*, No. 2:21-cv-02927-CAS-PD (C.D. Cal. filed Apr. 5, 2021). She was appointed to administer the receivership estate of 1inMM Capital, LLC, and its affiliated entities. The Receiver was authorized to conduct written discovery and investigate the scheme, and her work later disclosed facts important to the Net Losers concerning CNB's role.

35. After conducting discovery and a factual investigation, on February 16, 2024, the Receiver filed a detailed complaint against CNB in the Central District of California, captioned *Vives v. City Nat'l Bank*, No. 2:24-cv-01317-CAS-PVC (C.D. Cal. filed Feb. 16, 2024). (Exh. 1.) On April 29, 2026, that action was dismissed with prejudice. The dismissal rested in part on the Receiver's lack of constitutional and prudential standing to assert claims belonging to the Net Losers and on defenses applicable to the Receiver's estate and clawback claims. To the extent the dismissal addressed aiding-and-abetting allegations, it did so in the Receiver's procedural posture and on claims belonging to the receivership estate, not on the distinct Net Loser claims asserted here for CNB's alleged assistance in torts committed against investors.

36. The distinct Net Loser claims are now asserted in this action by the named Plaintiffs. Those claims are timely because Plaintiffs discovered the facts supporting CNB's aiding-and-abetting liability for the torts Horwitz committed against the Net Losers when Vives filed her complaint on February 16, 2024, less than three years before this action was filed.

37. Investor funds entered the 1inMM enterprise both directly and through a network of aggregators, feeders, and sub-feeders. These entities served as intermediaries that solicited, collected, and transmitted investor money to the 1inMM Entities for the benefit of Horwitz.

38. **JJMT Capital** was the largest aggregator. JJMT solicited investments for the purported 1inMM film-distribution-rights business, collected investor funds, and transmitted aggregated investments to 1inMM Capital accounts maintained at CNB.

39. JJMT also transmitted bundled investor funds directly to Horwitz's personal CNB account No. 5270. As reflected in Exhibit 7, JJMT Capital transmitted more than $21 million directly to Horwitz's non-business personal account No. 5270, including an $806,603 wire on September 12, 2017, and a $628,333 wire on October 10, 2017. These investor-generated funds were transmitted to Horwitz's personal account, which he opened in 2013 for personal expenses. The business-related wires reviewed by CNB were sent shortly before the October 24, 2017 investigation of the relationship between 1inMM Capital and JJMT Capital, which Plaintiffs allege gave CNB actual knowledge of the Ponzi scheme.

40. JJMT's principals included Jake Wunderlin, Joe deAlteris, Mathew Schweinzger, and Tyler Crookston. Investors associated with JJMT contributed approximately $490 million to the 1inMM enterprise, making JJMT the largest source of investor funds. (*See* Exh. 2 ¶ 15.)

41. **Ingen Funding I, LLC** was a Colorado limited liability company that operated as a sub-feeder to JJMT. Its managing members included Michael Russell and Matthew Iams.

42. Other principal aggregators included **Movie Fund, LLC**, SAC **Advisory Group, LLC**, and related SAC entities, **Vausse Films**, and **Pure Health Enterprises**. Together with JJMT, these entities are referred to as the "Aggregators."

43. Numerous additional sub-feeders solicited investor funds and transmitted those funds through the Aggregators and ultimately into the 1inMM enterprise. Discovery is necessary to identify all such sub-feeders, their principals, and the complete pathways through which Class Members' funds reached CNB.

44. Whether investors transmitted funds directly to 1inMM Capital or invested through an Aggregator or sub-feeder, those funds were deposited into, routed through, or are traceable to the 1inMM Capital accounts and Horwitz's personal account No. 5270 at CNB.

45. **Susan Kozlowski** is Zachary Horwitz's mother. In 2013, she opened a trust account at CNB and pledged that account as collateral for Horwitz's CNB personal line of credit. In May 2021, after the scheme collapsed, CNB sought and obtained court approval in the SEC action to liquidate Kozlowski's collateral account, pay off Horwitz's line of credit, close the account, and return any excess collateral proceeds to Kozlowski. CNB's records also show that 1inMM Capital paid Kozlowski or her trust $3.96 million through checks and a wire transfer from 2015 through 2017. (*See* Exhs. 19, 20.)

## V. AGENCY AND INTERMEDIARY ALLEGATIONS

46. CNB acted through its officers, employees, representatives, and agents. At all relevant times, CNB personnel who reviewed, monitored, approved, processed, transferred, credited, debited, underwrote, renewed, or otherwise acted upon activity involving the Horwitz and 1inMM accounts acted within the course and scope of their employment and authority.

47. CNB authorized, directed, participated in, approved, ratified, or knowingly permitted the conduct of its officers, employees, representatives, and agents alleged in this Complaint.

48. The Aggregators and their sub-agents served as intermediaries through which investor funds were solicited, collected, bundled, and transmitted to the 1inMM enterprise. Plaintiffs allege that the Aggregators and sub-agents acted as agents of Horwitz and his entities in transmitting information about the investments to the Net Losers.

49. For purposes of tracing, causation, class membership, and damages, funds invested through an Aggregator or sub-feeder are treated as investor funds provided to the 1inMM enterprise and as funds deposited into, routed through, or traceable to the 1inMM Capital accounts and Horwitz's personal account maintained at CNB.

## VI. INFORMATION ALLEGATIONS

50. The allegations concerning Plaintiffs' identities, investments, losses, and discovery of CNB's alleged role are based on personal knowledge. All other allegations are made on information and belief following an investigation conducted by Plaintiffs and their counsel.

51. Plaintiffs' allegations on information and belief are based on public records, criminal and SEC proceedings arising from Horwitz's fraud, public filings by the Receiver, available banking and transactional records, investment documents, communications with investors, and other materials reviewed or obtained by Plaintiffs and their counsel after counsel was retained.

52. Many facts concerning CNB's knowledge, internal reviews, underwriting decisions, source-of-repayment analyses, wire approvals, overdraft handling, transaction

monitoring, detailed transaction records, and internal communications are within CNB's possession, custody, or control, or were obtained by the Receiver during her investigation.

53. Plaintiffs allege such matters on information and belief where the relevant facts are peculiarly within CNB's knowledge or control or where those facts are supported by public filings, transactional records, and reasonable inferences arising from the conduct alleged herein.

54. Each allegation and factual contention in this Complaint has evidentiary support or, alternatively, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

## VII. DELAYED DISCOVERY OF CNB'S ROLE

55. Plaintiffs learned at different times in early 2021, and no later than April 2021, that Horwitz and 1inMM had operated a Ponzi scheme and that they had suffered losses as a result. Plaintiffs do not allege delayed discovery of Horwitz's fraud. Rather, they allege delayed discovery of CNB's own role—namely, that CNB possessed actual knowledge of the fraud, substantially assisted it, and received, retained, concealed, withheld, or aided in concealing or withholding investor money after knowing that it had been fraudulently obtained. Those bank-specific facts first became public in a form sufficient to alert Plaintiffs to CNB's potential liability when the Receiver filed her complaint against CNB on February 16, 2024. (*See* Exh. 16 (*Evans v. ZB, N.A.*, No. 2:17-cv-01123 WBS DB, 2019 WL 6918278, at *4–5 (E.D. Cal. Dec. 18, 2019).)

56. The public information available in 2021 revealed that Horwitz had operated a Ponzi scheme, maintained accounts at CNB, moved investor funds through those accounts, used a CNB personal account for personal spending, and maintained a CNB line of credit. Those facts demonstrated Horwitz's misconduct. They did not reveal that CNB itself had actual

knowledge of the fraud, substantially assisted it, or received or retained investor money for its own benefit after knowing that the money had been obtained by fraud. Before the Receiver conducted discovery and filed her complaint on February 16, 2024, publicly available materials did not disclose the bank-specific facts alleged here, including CNB's internal lending records, repayment-source reviews, overdraft reviews, wire-review records, transaction-monitoring records, October 2017 JJMT investigation, and records showing CNB's receipt or retention of investor money for its own credit exposure, including principal, interest, fees, overdraft exposure, and other amounts owed to or received by CNB. Plaintiffs therefore allege that the three-year statute of limitations began to run on February 16, 2024, and that this action is timely.

57. CNB contends that publicly available information in 2021 was sufficient to put Net Losers on inquiry notice of a claim against CNB. CNB further contends that the three-year statute of limitations began to run in 2021, that any claim based on its alleged participation in Horwitz's fraud or knowing receipt, retention, concealment, or withholding of investor money had to be filed by 2024, and that this 2026 action is therefore time-barred. Plaintiffs dispute that contention.

58. Plaintiffs' position is also informed by prior litigation involving generalized Bank Secrecy Act and red-flag theories against CNB. In *Nairn v. City Nat'l Bank*, No. BC606667 (Cal. Super. Ct., L.A. Cnty.), a Los Angeles Superior Court proceeding involving another alleged Ponzi scheme, CNB obtained an anti-SLAPP sanctions award against Net Loser investors who alleged Bank Secrecy Act-derived knowledge. The *Nairn* sanctions order is attached as Exhibit 17.

59. Also pertinent is a Horwitz-related class complaint filed against CNB on April 20, 2021, captioned *Whitmore v. Horwitz*, No. 2:21-cv-03393-CAS-GJS (C.D. Cal. filed Apr.

20, 2021). The action named CNB as an additional defendant and asserted aiding-and-abetting claims against the bank. *Whitmore* alleged, in substance, that CNB was obligated to investigate its customers under the Bank Secrecy Act ("BSA") and therefore must have investigated Horwitz and 1inMM Capital, and it must have discovered the Ponzi scheme based on BSA red flags. Those allegations resembled the theories advanced in *Nairn v. City Nat'l Bank*. *Whitmore* did not disclose the bank-specific facts alleged here, including CNB's lending records, source-of-repayment reviews, overdraft reviews, transaction-monitoring records, wire reviews, or the October 2017 JJMT-1inMM Capital investigation into the circular transactions alleged in Exhibit 3.

60. Without explanation or notice to the proposed class by counsel to the Plaintiffs or the Defendant bank, *Whitmore* voluntarily dismissed CNB as an aiding-and-abetting defendant on July 23, 2021. (ECF No. 24, attached as Exh. 18.) After the dismissal, third-party discovery was propounded by *Whitmore* from CNB. On June 30, 2022, *Whitmore* voluntarily dismissed the two remaining defendants, Horwitz and 1inMM Capital, because the court in the SEC action had entered an injunction against litigation over receivership assets after appointing Michele Vives as the Receiver. Once all defendants were dismissed, the *Whitmore* action could no longer proceed with third-party discovery directed at CNB because no defendant remained in the case. After June 30, 2022, information about CNB's role in the Ponzi scheme came only from the Receiver's investigation of CNB and the filing of her complaint set out as Exhibit 1. (*See* Exh. 18.) The named Plaintiffs in this action did not learn of *Whitmore* until 2026. Plaintiffs are informed and believe that, while *Whitmore* was pending, no Class Member other than the named plaintiffs in that case knew of the action.

61. *Whitmore* did not place Plaintiffs on inquiry notice of the bank-specific facts underlying CNB's alleged wrongdoing. At most, it disclosed an unsuccessful attempt to impose liability based on generalized red flags and BSA regulatory duties owed to the government rather than to non-customers of the bank. Those theories did not disclose CNB's internal lending records, repayment-source reviews, overdraft records, wire-review materials, or October 2017 investigation. Nor did they provide Plaintiffs with a practical pre-suit means to obtain those materials from CNB.

62. Treating an aiding-and-abetting complaint that was filed and dismissed before bank-specific supporting facts were available as immediately starting the statute of limitations would penalize investors for not filing before the facts necessary to plead the bank's independent wrongdoing were available. Plaintiffs allege that the limitations period did not begin until the Receiver's February 16, 2024 complaint disclosed those facts.

63. CNB's public posture in the SEC enforcement proceeding also reinforced, rather than dispelled, the absence of inquiry notice. On May 21, 2021, CNB presented itself to the court in the SEC action as a lender seeking repayment of Horwitz's line-of-credit debt from collateral pledged by his mother, Susan Kozlowski. The ex parte application and the order granting it are attached as Exhibit 19. Plaintiffs do not allege liability based on CNB's petitioning activity; they allege those events only as evidence of notice, knowledge, context, and the discovery-rule facts bearing on public information available to the Class of Net Losers concerning CNB's role from 2013 to 2019—as an innocent lender or as an aider and abettor. Exhibit 19 is alleged for that limited evidentiary purpose, not as a basis for liability based on petitioning activity.

64. The named Plaintiffs and the Net Losers loaned money to Horwitz and 1inMM Capital without knowing that Horwitz was misappropriating investor funds and that he did not intend to repay them from legitimate film-rights revenue. CNB also advanced funds to Horwitz near the end of the scheme. Plaintiffs allege that, by then, CNB possessed internal records showing that the line of credit had repeatedly reached a zero balance and that later advances were being repaid or replenished with investor funds rather than legitimate business revenue.

65. In the SEC enforcement proceeding, CNB sought an order permitting it to satisfy the line-of-credit balance from Kozlowski's collateral and to return any remaining collateral proceeds to Kozlowski. The application did not publicly disclose the internal bank facts alleged here, including CNB's October 24, 2017 investigation of 1inMM Capital and JJMT, the later zero-balance events followed by new CNB advances, or CNB's records concerning payments from 1inMM Capital to Kozlowski.

66. As reflected in Exhibit 19, on June 1, 2021, the court in the SEC action entered an order permitting CNB to be paid in full on Horwitz's loan from the collateral and allowing Kozlowski to receive any remainder. Those public proceedings presented CNB as a creditor of Horwitz, not as a bank whose own records showed actual knowledge and substantial assistance.

67. Exhibit 20 contains CNB business records that were available to CNB Vice President Michael C. Frazier when he signed his declaration in Exhibit 19. They show payments from 1inMM Capital account #0290 to Susan Kozlowski. In 2015, 1inMM Capital issued five checks to Kozlowski for $360,000 each, totaling $1.8 million. In 2016, 1inMM Capital issued five additional checks to Kozlowski for $360,000 each, again totaling $1.8 million. In 2017, 1inMM Capital account #0290 wired $360,000 to Kozlowski, and CNB's Transaction Detail Report identified her as the wire beneficiary. These records are relevant to CNB's knowledge

and to the public posture CNB took in the SEC enforcement proceeding when it argued Kozlowski was entitled to the remaining proceeds of her collateral after CNB was paid.

68. In relation to the $1.14 million collateral pledge, Kozlowski received payments totaling $3.96 million from 1inMM Capital, for a net gain of approximately $2.82 million. Plaintiffs allege these facts were not publicly disclosed in a way that would have alerted Net Losers to CNB's alleged actual knowledge or substantial assistance before the Receiver filed her complaint on February 16, 2024.

69. On October 24, 2017, CNB investigated the relationship between JJMT and 1inMM Capital, providing a key basis for alleging CNB's knowledge of the Ponzi scheme and its terms. The scheme continued after CNB's October 24, 2017 investigation, including through late-stage 2019 and 2020 account activity before its collapse in April 2021. From October 24, 2017 to October 9, 2019, the line of credit at CNB reached a zero balance in excess of 30 times. (*See* Exh. 8.) After October 9, 2019, CNB advanced new funds, leaving an outstanding LOC balance of $1,139,734.28 as of March 29, 2021. Plaintiffs allege that the post-October 2017 advances were relevant to CNB's substantial assistance and to when Plaintiffs could reasonably discover CNB's role.

70. On January 14, 2022, the district court appointed Michele Vives as Receiver for the 1inMM Entities and charged her with investigating the scheme. Vives filed her complaint against CNB on February 16, 2024. Before February 16, 2024, neither public receivership materials nor other publicly available information disclosed the bank-specific facts alleged in this Complaint. To the contrary, CNB appeared primarily as a creditor that had sought and obtained repayment in the SEC action and later appeared to be cooperating with the receivership.

71. Plaintiffs were not given access to CNB's internal credit files, underwriting records, source-of-repayment analyses, transaction-monitoring records, wire-review materials, overdraft records, and internal communications.

72. The material facts Plaintiffs did not know and could not reasonably have known before February 16, 2024 included, among other things, that CNB:

a. maintained and renewed a substantial credit relationship with Horwitz and the 1inMM enterprise;

b. had its own business reason to examine the use of funds and source of repayment because CNB was lending its own money;

c. observed CNB-issued credit being routed through Horwitz-related accounts and used to make investor payments;

d. observed new investor deposits being used to repay or replenish CNB-issued credit;

e. observed rapid, same-day or near-same-day circular fund movements among the line of credit, Horwitz's personal account, and the 1inMM accounts;

f. reviewed or approved repeated overdrafts, NSF items, and similar events requiring account-level scrutiny;

g. generated or maintained detailed transaction reports, wire-review records, and account-monitoring records reflecting those patterns;

h. reviewed wire activity showing large, round-number flows between 1inMM Capital and JJMT;

i. investigated the September 2017 circular wires between 1inMM Capital and JJMT, required Horwitz to explain those transactions, and possessed account records contradicting his explanation;

j. possessed account and lending records showing no legitimate film-rights purchases, no studio revenue, and no business activity consistent with Horwitz's representations about HBO, Netflix, Sony, and similar counterparties; and

k. received or retained investor money for its own benefit, including through repayment or replenishment of CNB's credit exposure, after CNB knew the money had been obtained by fraud.

73. Those facts were not public red flags. They were internal CNB facts concerning CNB's own lending relationship, account reviews, repayment-source reviews, wire approvals, overdraft handling, transaction records, and October 2017 investigation. Plaintiffs were investors, not bank insiders. They had no right to inspect CNB's internal files, no ability to compel pre-suit discovery from CNB, and no known viable access to the Receiver's non-public investigative materials.

74. Those facts first became public in a form sufficient to alert Plaintiffs to CNB's potential liability when the Receiver filed her complaint against CNB on February 16, 2024. Unlike the generalized red-flag allegations previously available, the Receiver's complaint disclosed facts supporting the inference that CNB itself, through its own lending, account monitoring, transaction records, and October 2017 investigation, had actual knowledge of the fraud, substantially assisted it, and knowingly received, retained, concealed, withheld, or assisted in concealing or withholding investor money obtained by fraud.

75. Plaintiff Jeff Ask learned that Horwitz and 1inMM had operated a fraudulent scheme on or about February 26, 2021, when Ingen informed Ask that the 1inMM business was a fraud. JASKGOLF, LLC learned those facts through Ask, who was its sole member and the person responsible for its investment-related decisions. At that time, Ask and JASKGOLF understood that Horwitz and 1inMM had defrauded investors through false representations about film-rights transactions. They did not then know facts suggesting that CNB itself had actual knowledge of the fraud, had substantially assisted it, or had knowingly received, retained, concealed, withheld, or assisted in concealing or withholding investor money obtained by fraud. Until 2026, Ask was unaware of the Whitmore action. Ask and JASKGOLF first learned of the Receiver's February 16, 2024 complaint against CNB months later, when the Receiver informed Ask that she had sued City National Bank. After learning of the Receiver's action, Ask and JASKGOLF discussed the matter with counsel. Before February 16, 2024, publicly available materials did not disclose the bank-specific facts necessary to plead a viable aiding-and-abetting or Penal Code § 496 claim against CNB based on actual knowledge, substantial assistance, and knowing receipt, retention, concealment, or withholding of investor money obtained by fraud. Before February 16, 2024, Ask relied on the investigative powers of the federal-court-appointed Receiver to identify potential defendants, and he believed that Receiver Vives was working diligently to identify potential defendants based on her periodic reports filed in court and her notices sent to creditors of the scheme.

76. Plaintiff Robert Henny learned he had invested in a Ponzi scheme in early 2021, a few weeks before Horwitz was arrested. On January 14, 2022, the district court appointed Michele Vives as Receiver for the 1inMM Entities and charged her with investigating the scheme. Vives filed her complaint against CNB on February 16, 2024. Before February 16,

2024, Henny had no information about the bank-specific facts alleged by Vives in Exhibit 1, including facts showing CNB's actual knowledge, substantial assistance, or knowing receipt, retention, concealment, or withholding of investor money obtained by fraud. To the contrary, CNB appeared to Henny to be a creditor of Horwitz that had sought and obtained repayment in the SEC action and later appeared to be cooperating with the receivership. Henny did not know facts suggesting that CNB's own records supported affirmative claims against the bank. Henny was not aware of the allegations in the Whitmore complaint against City National Bank until 2026.

77. Plaintiff James Ryley learned he had invested in a Ponzi scheme in or about 2021. Ryley discovered the role played by CNB after Michele Vives filed her complaint against the bank on February 16, 2024. Before February 16, 2024, Ryley had no information about the bank-specific facts alleged by Vives in her complaint, including facts showing CNB's actual knowledge, substantial assistance, or knowing receipt, retention, concealment, or withholding of investor money obtained by fraud. To the contrary, CNB appeared to Ryley to be a creditor of Horwitz that had sought and obtained repayment in the SEC action and later appeared to be cooperating with the receivership.

78. Even if Plaintiffs had investigated CNB in 2021 after learning of Horwitz's fraud or after Whitmore was filed, a reasonable investigation would not have revealed the non-public bank records disclosed by the Receiver on which this action depends, including records bearing on CNB's actual knowledge, substantial assistance, and knowing receipt, retention, concealment, withholding, or assistance in concealing or withholding investor money obtained by fraud.

## VIII. FACTUAL ALLEGATIONS

79. Plaintiffs reallege the foregoing paragraphs as if set forth fully herein.

### A. Horwitz and 1inMM Operated a Ponzi Scheme.

80. From approximately 2013 through 2019, Zachary Horwitz solicited and obtained investor funds through 1inMM Capital and related entities as part of a Ponzi scheme. The scheme then continued through late-stage account activity, lulling, recycling, and dissipation of investor funds before collapsing in April 2021. Horwitz and 1inMM represented to investors that 1inMM acquired film-distribution rights and resold or licensed them at a profit to companies such as HBO, Netflix, and Sony. That business did not exist. Exhibits 11 and 12 identify films used in the scheme, and Exhibit 12 shows that CNB knew some of those titles because they appeared in its Transaction Detail Reports for investor wires.

81. Investors were told their money would buy film rights and that principal and promised returns would be paid from legitimate film-distribution transactions. (*See* Exh. 1.) Those uniform representations were false. 1inMM did not acquire film rights, did not receive revenue from HBO, Netflix, Sony, or similar counterparties, and had no legitimate business capable of generating the promised returns.

82. A real film-rights business would have produced recognizable account activity, including payments to rights holders, producers, distributors, or other industry participants, and revenue from purchasers, licensees, studios, streamers, or similar counterparties.

83. CNB's account records showed none of that. They showed no payments for film rights and no revenue from HBO, Netflix, Sony, or comparable counterparties. Instead, investor funds flowed into the enterprise and back out to earlier investors, aggregators, commission recipients, Horwitz, related parties, and CNB. (*See* Exhs. 1, 2, 3.)

84. During the scheme, approximately $710 million was deposited into 1inMM Capital accounts at CNB. At least $690 million came through five principal aggregators that solicited investors, collected funds, and transmitted them to 1inMM Capital accounts #0290 and #2944 at CNB. (*See* Exh. 2.)

85. Those aggregators were JJMT Capital, Movie Fund, SAC-related entities, Vausse Films, and Pure Health. JJMT was the largest, transmitting approximately $490 million into the 1inMM enterprise. The others accounted for approximately $80 million from Movie Fund, $78.6 million from SAC-related entities, $21 million from Vausse Films, and $20.4 million from Pure Health. (*See* Exh. 2.)

86. Although organized through different entities, the aggregators served the same role: they solicited investments based on the uniform representation that 1inMM would use investor funds to acquire film-distribution rights and generate returns through resale or licensing. Investment materials identified specific films, investment amounts, maturity dates, and purported counterparties, including HBO Studios and Netflix. (*See* Exhs. 11, 12.)

87. Investor funds were not used as represented. They were used to pay earlier investors, aggregators, commission recipients, CNB, Horwitz's lifestyle expenses, and other costs unrelated to any legitimate film-rights business. (*See* Exhs. 1, 2, 5.)

88. The scheme depended on lulling payments. Timely payments created the false appearance that 1inMM was generating legitimate film-distribution profits, although the payments came from new investor funds, CNB credit, or money recycled through Horwitz-controlled accounts. (*See* Exhs. 1, 2.)

89. The scheme collapsed with substantial investor losses. Lorraine Pearson's sworn declaration states that unpaid principal owed to investors through the five principal aggregators

exceeds $234.7 million, including approximately $165 million owed to the JJMT investor group. (*See* Exh. 2.) Plaintiffs' and the Class's damages will be proven through discovery and classwide proof.

90. Horwitz later admitted the fraud, pleaded guilty to securities fraud, received a twenty-year prison sentence, and was ordered to pay more than $200 million in restitution. (*See* Exh. 1.)

91. Money obtained from Plaintiffs and Class Members through Horwitz's and 1inMM's false representations and fraudulent concealment was property obtained in a manner constituting theft within the meaning of California Penal Code §§ 484 and 496. The investor money that moved through the Horwitz and 1inMM accounts therefore constituted stolen property or property obtained in a manner constituting theft.

**B. Plaintiffs and the Class Invested in the Scheme.**

92. Plaintiffs and Class Members invested in 1inMM, reasonably relying on misrepresentations that their funds would be used to acquire legitimate film-distribution rights for profitable resale or licensing and the uniform concealment of the fact that Horwitz was running a Ponzi scheme.

93. They invested directly with 1inMM or indirectly through JJMT, another Aggregator, or an affiliated sub-feeder. Regardless of channel, they invested in the same represented business and were exposed to the same fraud.

94. Their funds were deposited into, routed through, or are traceable to 1inMM Capital accounts #0290 and #2944 and Horwitz's personal account #5270 at CNB. (*See* Exhs. 4, 7.) Those accounts served as the scheme's financial hub.

95. Plaintiffs and Class Members are Net Losers because they received less from 1inMM than they invested. Their losses arose from the same course of conduct: the sale of purported film-rights investments and the use of investor funds for purported returns and lulling payments to earlier investors.

96. Plaintiffs sue for themselves and similarly situated Net Losers whose losses resulted from money invested in, retained by, recycled through, or dissipated by the 1inMM enterprise after CNB acquired actual knowledge no later than October 2017, regardless of whether the original investment occurred before or after CNB acquired actual knowledge.

**C. CNB Had Repeated Points of Visibility into the Scheme.**

97. CNB did more than maintain the Horwitz and 1inMM Capital accounts. Through routine banking reviews, it repeatedly examined balances, credits, debits, wires, overdrafts, and the sources and uses of funds moving through the linked Horwitz-related accounts.

98. Those reviews gave CNB direct visibility into the fraud: investor funds came in, payments went to investors and related recipients, legitimate film-rights activity was absent, and internal transfers and CNB credit increasingly sustained payment flows.

1. <u>CNB Conducted Enhanced Due Diligence over 1inMM Capital Because It Was an NAICS 525990 Entity.</u>

99. When Horwitz opened 1inMM Capital account #0290 in 2013, he told CNB that his “Feature Film Finance Company” would handle other people’s money. That representation required CNB to evaluate the customer, the account’s purpose, expected activity, and the sources and uses of funds.

100. CNB’s account-opening records show that 1inMM Capital was not treated as an ordinary deposit customer. CNB classified the account under NAICS 525990, a category for

specialized financial vehicles that hold or manage others' funds, and subjected the new investor-fund account to Enhanced Due Diligence ("EDD").

101. CNB's account-opening materials reflected that EDD was required because 1inMM Capital was a start-up, would handle investor funds, and lacked an earnings history. EDD required risk-based review of Horwitz's business, expected activity, incoming funds, and outgoing uses—the same categories that later revealed the fraud. The account application and NAICS 525990 designation appear in Exhibit 2 at page 23 of 78 and in Exhibit 21.

102. CNB's records also showed no operating-income history: the stated-income field was blank. Yet investor deposits reached approximately $465,000 within three months, exceeded $3 million within fifteen months, and grew to approximately $349 million annually by 2019, without corresponding activity consistent with the business Horwitz described. (*See* Exhs. 4, 21.)

103. CDD and EDD were ongoing, not one-time, reviews for the bank's own protection and for the benefit of its shareholders. As account volume increased, large transfers occurred, overdrafts arose, and CNB personnel interacted with Horwitz and the 1inMM Entities, CNB repeatedly reviewed balances, transactions, wires, sources and uses of funds, and account patterns. Plaintiffs allege CDD and EDD as evidence of what CNB actually reviewed and knew, not as an independent duty owed to Plaintiffs or the Class.

104. Those reviews showed that the accounts did not operate like a legitimate film-finance business. Inflows came mainly from investor deposits, Aggregator transfers, and CNB credit; outflows went to investors, Aggregators, commission recipients, Horwitz, related parties, and CNB.

2. CNB's Entertainment-Industry Expertise Made Horwitz's Story Inconsistent with Legitimate Film-Finance Activity by October 2017.

105. CNB had industry-specific visibility into the 1inMM enterprise. It marketed itself as Hollywood's bank, assigned senior entertainment-banking personnel to Horwitz and the 1inMM entities, monitored the relationship, reviewed account activity, and offered banking services tailored to the business Horwitz claimed to operate.

106. Because CNB specialized in entertainment banking, it understood that a legitimate film-finance or film-rights business would ordinarily show payments to rights holders, producers, distributors, and similar industry participants, as well as revenue or royalty payments from studios, streamers, or other licensees.

107. The Horwitz and 1inMM accounts showed none of those patterns. They reflected investor deposits, investor-related payments, internal transfers, and other transactions inconsistent with the business Horwitz described. By October 2017, CNB's entertainment-industry experience made that story implausible.

108. The disconnect was especially clear in 1inMM Productions account #1130. Horwitz claimed that 1inMM Capital financed 1inMM Productions and that 1inMM Productions handled physical production and public-facing industry activity. If true, account #1130 would have shown production-related payments to cast, crew, vendors, locations, insurers, post-production providers, distributors, and similar participants.

109. Instead, CNB's records for account #1130 showed no meaningful production activity. They showed personal and luxury-related spending, including luxury-vehicle payments and American Express charges, contradicting Horwitz's explanation and undermining the legitimacy of the represented business.

110. When Horwitz later explained the enterprise to CNB, the bank had the account records needed to test his explanation. Those records did not support any legitimate production or film-finance business.

111. If Horwitz and 1inMM had substantial relationships with major entertainment counterparties, that activity would have appeared in the accounts and created significant legitimate banking opportunities for CNB. It did not appear because those relationships and transactions did not exist.

112. CNB's due-diligence process therefore exposed the mismatch between Horwitz's claimed film-finance business and the actual account activity: continuous movement of investor funds through the 1inMM enterprise.

3. CNB's Own Transaction Detail Reports Documented the Movie Fraud.

113. Exhibit 11 contains two late-stage lists of movies purportedly purchased by Horwitz in 2019 for resale of rights to HBO and Netflix. Plaintiffs incorporate Exhibit 11 here by reference.

114. Exhibit 12 contains examples of CNB Transaction Detail Reports ("TDRs") for incoming wires into 1inMM Capital account #0290, including TDRs identifying films supplied by investors when initiating wires. These records identified each wire's source, amount, date, and stated purpose. Dates appeared in year-month-day format; for example, "160104" means January 4, 2016.

115. Exhibit 12 shows that many 2016 investor wires identified specific films whose rights investors believed their money would acquire for later resale to HBO and Netflix.

116. January 2016 in Exhibit 12 illustrates the pattern. CNB's TDRs recorded JJMT wires to 1inMM Capital for purported rights to "Pali Road" and "Alone in Berlin" ($1.1 million

on January 4), "Perfect Weapon" ($655,900 on January 19), and "No Solicitors" ($690,500 on January 27).

117. Those records showed both the investor-facing story—funds supposedly used to acquire named film rights for resale to streamers—and the actual movement of money through Horwitz's accounts.

118. The TDRs and account summaries showed no corresponding payments to film producers and no payments from HBO, Netflix, or other buyers. CNB's records therefore exposed the mismatch between the represented film-rights business and the actual account activity.

119. CNB's transaction records gave it transaction-level visibility into the fraud: investor funds entered under a film-investment narrative but were redistributed to investors, Aggregators, commission recipients, Horwitz, related parties, and CNB itself.

120. Exhibit 13 contains Account Summary Statements for accounts #0290 and #5270 showing millions of dollars in circular January 2016 flows while CNB prepared the corresponding January 2016 TDRs attached as Exhibit 12.

121. Exhibit 13 shows that 1inMM Capital account #0290 began January 2016 with $806.59 and ended with $594.59. Those minimal balances were inconsistent with a business supposedly generating millions from film-rights transactions and instead showed dependence on CNB LOC account #9641 to cover shortfalls.

122. Exhibit 13 also shows the January 4, 2016, $1,100,000 incoming wire from JJMT, described in Exhibit 12 as a loan to buy "Pali Road" and "Alone in Berlin." The $1,100,000 wire can be seen in Exhibit 4 as the January 4, 2016 deposit.

123. That month, Exhibit 6 shows that Horwitz's personal account #5270 sent five deposits totaling $1,780,026.50 into 1inMM Capital account #0290, while Exhibit 5 shows that account #0290 sent five transfers totaling $3,124,900 back to account #5270, leaving a net $1,344,873.50 flow to Horwitz's personal account by month-end.

124. Personal account #5270 also shows how the LOC supported the scheme. After the January 4, 2016, $1,100,000 JJMT wire entered 1inMM Capital account #0290, funds moved through Horwitz's personal account #5270 and were used that same day to pay down CNB LOC account #9641. That sequence connected an investor-facing film-title wire directly to Horwitz's personal account and CNB's credit facility. Exhibit 9 reflects two same-day transfers from account #5270 to LOC account #9641 on January 4, 2016, each in the amount of $550,000, totaling the $1,100,000 deposited by JJMT into 1inMM Capital account #0290 that same day. Plaintiffs allege that more than one hundred same-day transfers were used to pay down the LOC, and that CNB knew when funds were received into its own account and from what source.

125. The January 4 sequence was not consistent with a legitimate film-rights transaction. The funds did not move to producers, rights owners, distributors, HBO, Netflix, Sony, or any other entertainment counterparty. They moved among the 1inMM Capital account, Horwitz's personal account, and CNB's LOC account.

126. The same month showed the recurring pattern. Investor-labeled funds entered 1inMM Capital account #0290 under a film-rights narrative, while CNB's account records showed internal transfers, LOC activity, and payments inconsistent with the represented purchase and resale of film-distribution rights.

127. These records gave CNB both sides of the transaction story. The TDRs showed what investors and Aggregators were told their money was for: specific film-rights investments. The account summaries and LOC records showed what actually happened to the money: it was moved through linked Horwitz-controlled accounts, used to cover liquidity needs, and routed in ways inconsistent with any legitimate film-finance business.

128. Read together, Exhibits 12 and 13 therefore did more than show ordinary banking activity. They showed investor money entering the CNB accounts under a specific film-investment narrative while CNB's own account records showed no corresponding film-rights purchases, no corresponding studio or streamer revenue, and repeated movement of money through Horwitz's personal account and CNB's credit facility.

129. The January 2016 records are representative of the broader account activity CNB reviewed throughout the relationship. They show why CNB's TDRs, account summaries, wire records, overdraft reviews, and LOC records must be considered together: each category of record confirmed that investor funds were not being used or repaid as represented.

130. These facts support the reasonable inference that CNB had transaction-level visibility into the fraud years before the October 2017 JJMT investigation. At minimum, they provide the factual background explaining why CNB's October 2017 investigation did not occur in isolation, but after years of account activity contradicting Horwitz's claimed film-rights business.

131. The more detailed LOC and flow-of-funds allegations are set out below in Section VIII.D. Those allegations address CNB's lending relationship, Horwitz's use of the LOC as a de facto cash-management account, same-day circular transfers among CNB

accounts, investor-related payments made with CNB credit, and repayment of CNB with investor money.

### 4. CNB's Hundreds of Wire Reviews Repeatedly Exposed the Same Fraudulent Account Activity.

132. A wire transfer exposes a bank to risk similar to a cashier's check. The bank's own money is at risk if there are insufficient customer funds to pay for the wire. Therefore, CNB required its employees to review the relevant credits and debits before sending outgoing wires from the 1inMM accounts. The bank did not process outgoing domestic wires automatically. Before releasing a wire, at least two CNB personnel were required to review the wire request, account balances, and related account activity to determine whether sufficient funds existed and whether the transfer should be approved by the back-office Wire Department.

133. Horwitz and 1inMM initiated hundreds of outgoing wires to investors, Aggregators, and related recipients. Each wire request required another CNB review of the pattern of incoming and outgoing transactions flowing through the accounts.

134. Those reviews repeatedly revealed the same pattern: substantial investor deposits and Aggregator transfers entered the accounts, while substantial outgoing wires returned funds to investors, Aggregators, investor-related parties, and other recipients.

135. The wire activity did not resemble the operation of a legitimate film-finance enterprise. Instead, the reviews repeatedly exposed the movement and redistribution of investor funds throughout the 1inMM enterprise.

### 5. CNB's Mandatory Overdraft Reviews Required Repeated Account-Level Scrutiny.

136. CNB's repeated review of 1inMM's overdrafts and NSF items provides additional inferential evidence of the visibility of the Ponzi scheme and CNB's knowledge of it.

When an account lacked sufficient funds to cover a check, transfer, or requested wire, CNB had to determine whether to reject the item, honor it with a temporary loan, require a cure, or otherwise manage the bank's exposure. The bank risked liability if it paid overdrafts without sufficient funds in the account.

137. Horwitz-related accounts generated over one hundred overdraft and NSF events. CNB personnel communicated directly with Horwitz regarding those events, reviewed account balances and recent transaction activity, and permitted deficiencies to be cured. (*See* Exh. 10 for examples of emails to Horwitz requesting cures on overdrafts.) Each unfunded event required account-level review. Plaintiffs allege that those reviews disclosed the recurring pattern of investor inflows, internal transfers, CNB credit, and investor-related payments that revealed the Ponzi scheme.

138. By August 16, 2016, Horwitz-related accounts had generated at least 87 overdraft or NSF events. (*See* Exhs. 1, 10.) Additional overdraft and NSF events occurred later in the Horwitz Personal Account, the 1inMM Capital Account, and the 1inMM Productions Account. Each recurring deficiency required senior CNB personnel to examine the linked Horwitz accounts, review the movement of funds among them, and decide how to manage the bank's exposure.

139. One example illustrates the scrutiny involved. On December 14, 2015, CNB Vice President Staci Riven received an overdraft alert for 1inMM Productions account #1130. Rather than reject the item, CNB allowed the deficiency to be cured through a temporary advance and instructed Horwitz to cover the shortfall immediately. Riven sent Horwitz a "High Importance" email stating: "Good morning, The balance in the account is $-4,640.73. Please cover. Thank you." (Exh. 10.) The negative balance was significant because it meant CNB had advanced its

own funds to cover the account's obligation. In other words, the overdraft required CNB to use bank funds temporarily, creating direct exposure until Horwitz cured the deficiency.

140. Horwitz cured the deficiency that same day by transferring funds from Personal Account #5270 to account #1130. The cure was revealing because account #5270 was funded by transfers from 1inMM Capital account #0290 and by CNB line-of-credit advances. CNB therefore saw money moving on the same day among the same linked accounts used to receive investor deposits and repay the bank.

141. The overdraft did not occur in isolation. One week earlier, on December 7, 2015, Horwitz had transferred $12,000 from account #1130 to 1inMM Capital account #0290. The following week, account #1130 required CNB intervention to avoid a payment failure. That sequence reflected the recurring movement of funds among linked accounts to satisfy ongoing payment obligations.

142. Riven's handling of the overdraft demonstrates more than passive account maintenance. It reflects direct review by a named CNB officer, communication with Horwitz regarding a deficiency, and observation of how that deficiency was resolved through transfers among related CNB accounts.

143. The overdraft reviews exposed recurring liquidity pressure despite substantial investor inflows. They also showed that shortfalls were covered with investor funds, internal transfers, or CNB credit—not revenue from ordinary business operations.

144. That visibility was significant because Ponzi schemes depend on timely payments. Bounced checks, rejected wires, and delayed investor payments expose the fraud and accelerate its collapse. CNB's repeated handling of overdrafts and NSF items therefore provided

a recurring view of the enterprise's dependence on new money and available credit to continue making payments. That handling also substantially assisted the scheme's continued operation.

145. Taken together, CNB's due diligence reviews, entertainment-banking relationships, transaction records, wire reviews, and overdraft reviews provided continuous visibility into the operation of the 1inMM enterprise and the flow of funds through the linked Horwitz accounts.

146. These repeated points of visibility provide important context for the October 2017 JJMT investigation. When CNB later required Horwitz to explain the JJMT transactions, it was not encountering the 1inMM accounts for the first time. Rather, the investigation occurred after years of account reviews that had already exposed substantial inconsistencies between Horwitz's representations and the actual account activity.

**D. CNB's LOC Lending and Repayment Records Showed Knowledge of the Scheme.**

147. CNB was both the depository bank and Horwitz's lender. Beginning in 2013, CNB extended Horwitz a revolving line of credit with a maximum available balance of approximately $1.14 million at any one time. Over the life of the scheme, CNB advanced approximately $64 million to Horwitz through that credit facility. (*See* Exhs. 8, 9.)

148. Because CNB was lending its own money, it had its own business reason to understand both the use of the loan proceeds and the source of repayment. CNB did not need to infer those facts from outside information. Horwitz and the 1inMM entities banked at CNB, and CNB's own records showed where the money went and how CNB was repaid. (*See* Exhs. 6, 8, 9.)

1. <u>CNB Extended and Renewed Credit to Horwitz.</u>

149. CNB's records identified LOC advances to Horwitz as "Sweep Increase" entries that increased Horwitz's debt to the bank. CNB's records identified repayments as "Payments" that reduced Horwitz's debt to CNB. (*See* Exh. 8.)

150. CNB repeatedly renewed the LOC from 2013 through 2019. Each renewal required CNB to evaluate Horwitz's creditworthiness, the use of the LOC, the source of repayment, and the accounts through which the scheme operated. Those reviews gave CNB repeated visibility into the same account activity that revealed the Ponzi scheme.

151. The LOC was not an ordinary consumer-credit relationship. CNB repeatedly advanced large, round-number sums to Horwitz, often followed by rapid repayment. Representative examples include:

a. $107,000 draw on May 28, 2013, repaid with $110,000 on May 30;

b. $92,000 draw on March 11, 2014, repaid with $105,000 on March 13;

c. $225,000 draw on June 23, 2014, followed by a $212,000 repayment on June 24; and

d. $335,000 draw on December 22, 2014, repaid with $413,095 on December 24.

152. These advances and repayments were reflected in CNB's records. CNB made the advances, received the repayments, recorded the transactions, and reviewed the relationship when it renewed the LOC. (*See* Exh. 8.)

2. <u>Horwitz Used the LOC as a De Facto Cash-Management Account.</u>

153. The LOC records showed an unusual pattern in late 2015 and early 2016. From at least September 2015 through February 2016, Horwitz used LOC account #9641 not merely

as a borrowing facility, but as a temporary cash-management account. At times, the LOC account carried a positive balance, meaning investor-derived funds had been moved into the LOC account in amounts exceeding the debt then owed to CNB. Exhibit 8 contains LOC accounting from September 2015 to February 2016 showing a sizable positive balance in an account set up to borrow money, not deposit money.

154. That positive-balance pattern contradicted the LOC's stated personal purpose and gave CNB additional underwriting visibility. A personal line of credit for "personal expenses" or "personal, family, or household purposes or personal investments" would not ordinarily operate as a cash account receiving large deposits traceable to investor inflows, then releasing those funds through Horwitz's personal account and the 1inMM Capital account to investor-related recipients. CNB's own records showed that Horwitz was using the LOC to manage liquidity for the 1inMM enterprise.

155. Exhibit 13 contains Account Summary Statements for 1inMM Capital account #0290 and Horwitz Personal Account #5270 showing millions of dollars in circular January 2016 flows while CNB prepared the corresponding January 2016 TDRs attached as Exhibit 12.

156. Exhibit 13 shows that 1inMM Capital account #0290 began January 2016 with $806.59 and ended the month with $594.59. Those minimal balances were inconsistent with a business supposedly generating millions of dollars from film-rights transactions. They instead showed dependence on transfers from Horwitz's personal account and the LOC to cover shortfalls.

157. January 4, 2016 illustrates the pattern. On that date, 1inMM Capital account #0290 received a $1,100,000 incoming wire from JJMT, described in CNB's TDRs as a loan to buy "Pali Road" and "Alone in Berlin." (Exh. 12.) That same day, Horwitz transferred two

$550,000 payments from 1inMM Capital account #0290 to Horwitz Personal Account #5270 and then to LOC account #9641. The transfers increased the LOC's positive balance, as reflected in Exhibit 8, rather than paying down ordinary personal debt. The January 4, 2016 flow is shown below:




158. The same January 2016 account summaries showed repeated same-day or near-same-day movements among 1inMM Capital account #0290, Horwitz Personal Account #5270, and LOC account #9641.

159. January 15, 2016 provides another example. On that date, $739,462.50 moved from LOC account #9641 to Horwitz Personal Account #5270, and then the same amount moved from Horwitz Personal Account #5270 into 1inMM Capital account #0290. The movement showed CNB loan proceeds being routed through Horwitz's personal account and into the 1inMM enterprise rather than being used for ordinary personal expenses.

160. On the same day, $999,999 from the LOC was transferred to his personal account, causing CNB to advance funds under the LOC. Horwitz then transferred $999,999

back to CNB to pay down the LOC, leaving a positive LOC balance of $832,088.29 at the end of the day.




161. On January 19, 2016, Horwitz drew $1,024,619 from LOC account #9641, creating a negative balance of approximately $192,530.71 in a loan from CNB to Horwitz. The same $1,024,619 then moved through Horwitz Personal Account #5270 and into 1inMM Capital account #0290. The movement again showed CNB loan proceeds being routed through Horwitz's personal account and into the 1inMM enterprise rather than to any legitimate personal purpose.

162. On January 19, 2016, $678,500 in new investor funds entered 1inMM Capital account #0290. That same amount then moved from 1inMM Capital to Horwitz Personal Account #5270, and from Horwitz Personal Account #5270 to CNB to pay down the LOC. Four days earlier, on January 15, 2016, CNB loan proceeds had moved in the opposite direction—from the LOC to Horwitz Personal Account #5270 and then into 1inMM Capital account #0290. (*See* Exhs. 8, 13.)




163. CNB's communications with Horwitz confirmed CNB's awareness of the LOC's unusual use. On February 10, 2016, after Horwitz could not transfer $10,000 into the LOC, he emailed Michael Mallon, a senior Vice President in CNB's Entertainment Division, about "other possibilities of cash accounts" from which funds could be transferred into the LOC. Mallon responded that the "main issue is that those [1inMM-related] business accounts are not formally tied to the credit facility." That response showed CNB knew Horwitz was trying to use business-account funds to manage the LOC. It also showed that CNB understood the relationship among the business accounts, Horwitz's personal account, and the LOC. (*See* Exh. 1.)

164. After that exchange, Horwitz's use of the LOC became more restrained, but the underlying pattern continued. LOC funds still moved through Horwitz Personal Account #5270 and 1inMM Capital account #0290 to investor-related recipients, while investor funds returned through the same accounts to repay or replenish the LOC.

3. <u>The LOC Was Not Used for Personal Expenses.</u>

165. CNB designated the LOC for "personal expenses" or "personal, family, or household purposes or personal investments." CNB's records showed otherwise. Large

advances repeatedly moved from the LOC to Horwitz Personal Account #5270, then to 1inMM-related accounts or investment-enterprise recipients. (*See* Exhs. 1, 6, 8.)

166. The size, frequency, and routing of the LOC advances made the stated personal purpose implausible. These were not ordinary personal consumption draws. They were large, round-number liquidity transfers used to support the 1inMM enterprise.

167. CNB knew that because it had the records. It saw advances leave LOC account #9641, enter Horwitz Personal Account #5270, move into 1inMM-related accounts, and then leave those accounts as payments to investors, aggregators, or investor-related recipients. (*See* Exhs. 6, 8, 9.)

4. <u>CNB's Loan Proceeds Were Used to Make Investor-Related Payments.</u>

168. The LOC functioned as a bridge between incoming investor deposits and outgoing investor-related payments. When new investor money was unavailable, insufficient, or not timely enough to meet payment obligations, Horwitz drew on the LOC and moved CNB's money through his personal account and into the 1inMM accounts. (*See* Exhs. 6, 8.)

169. The flow was direct. CNB advanced funds from LOC account #9641. The funds entered Horwitz Personal Account #5270. Horwitz then moved those funds into 1inMM Capital account #0290 or another Horwitz-related account. The funds were then wired or paid to investors, aggregators, or investor-related recipients. (*See* Exhs. 1, 6, 8, 9.)

170. CNB saw this movement because the transfers occurred within CNB accounts or through CNB-processed wires. CNB therefore knew that its own loan proceeds were not being used for personal expenses. They were being used to make investor-related payments and to keep the 1inMM scheme operating.

171. That use of CNB credit materially assisted the scheme. Ponzi schemes depend on timely payments to earlier investors. Delayed or missed payments expose the fraud. By advancing credit that Horwitz used to make investor-related payments, CNB helped prevent payment failures that could have revealed the scheme earlier.

5. CNB Was Repaid With Investor Money.

172. The repayment flow ran in reverse. Investor money entered 1inMM Capital account #0290 or another 1inMM-related account. Horwitz then moved those funds to Horwitz Personal Account #5270 and used them to make payments on LOC account #9641. (*See* Exhs. 5, 8, 9.)




173. CNB thus saw both sides of the cycle. It saw its money go out through the LOC and move toward investor-related payments. It then saw new investor money come back through the 1inMM accounts and Horwitz's personal account to repay or replenish CNB's credit. (*See* Exhs. 8, 9.)

174. CNB's records showed no independent source of repayment. The accounts showed no revenue from HBO, Netflix, Sony, or any other legitimate film-rights counterparty. They showed investor deposits being recycled through Horwitz-related accounts and used, in part, to reduce CNB's credit exposure.

175. CNB therefore benefited directly from the same fraud reflected in its records. Investor money did not merely pass through CNB. Investor money repaid CNB's own credit exposure. (*See* Exh. 9.)

176. Plaintiffs allege that, after CNB acquired actual knowledge, these repayments constituted CNB's receipt and retention of investor money obtained by fraud. CNB received that money for its own benefit, including through repayment or replenishment of principal, interest, fees, overdraft exposure, and other credit exposure owed to or held by CNB.

6. <u>The Circular Flow of Funds Made the Scheme Apparent.</u>

177. The combined advance-and-repayment pattern illustrated above revealed the scheme. CNB's funds moved from LOC account #9641 to Horwitz Personal Account #5270, then to 1inMM Capital account #0290 or another related account, and then to investors, aggregators, or investor-related recipients. New investor money then moved from the 1inMM accounts back to Horwitz Personal Account #5270 and then to CNB to repay or replenish the LOC. (*See* Exhs. 5, 6, 8, 9.)

178. Exhibit 9 confirms that this circular flow was not isolated. It identifies 135 same-day transfers totaling millions of dollars among the same linked CNB accounts. Funds repeatedly moved from business accounts to Horwitz Personal Account #5270 and then to LOC account #9641, while the LOC simultaneously funded debits in those same business accounts. There was no legitimate business reason to route funds through three related CNB accounts on the same day or within days if the purpose was simply to pay CNB or move money to a legitimate film-rights counterparty. The routing instead showed CNB that the accounts were being used as a liquidity mechanism for the 1inMM enterprise.

179. That circular flow was inconsistent with Horwitz's stated business model. A legitimate film-rights business would have shown money moving to rights holders and revenue coming back from purchasers or licensees such as HBO, Netflix, or Sony. The LOC records instead showed bank credit and investor money being recycled to maintain payment flows.

180. The circularity also had no legitimate business purpose. If the purpose were simply to repay CNB or move funds to a legitimate counterparty, the transfers did not need to be routed through three linked CNB accounts on the same day or within days. The routing instead showed CNB that Horwitz was using the accounts as a mechanism for payment timing, liquidity management, and concealment of the absence of real business revenue.

181. CNB's lending records therefore reinforced what its due-diligence reviews, transaction records, wire reviews, entertainment-banking oversight, and overdraft reviews already showed: there was no legitimate film-rights business, no studio revenue, and no source of repayment other than investor money and recycled bank credit.

7. <u>These LOC Facts Support Actual Knowledge No Later Than October 2017.</u>

182. These LOC facts support CNB's actual knowledge no later than October 2017. By then, CNB had years of lending and repayment records showing that the LOC was not being used for personal expenses, that CNB's loan proceeds were being used for investor-related payments, that investor money was being used to repay CNB, and that the circular flow of funds was inconsistent with any legitimate film-rights business.

183. The same facts also support the inference that CNB knew before October 2017. Plaintiffs need not prove earlier knowledge to state a claim based on CNB's post-October 2017 assistance, but the LOC records show that CNB's October 2017 knowledge was not sudden, accidental, or based on a single event. It was the culmination of years of lending, underwriting,

renewal, repayment-source, and account-level records revealing the same Ponzi-scheme pattern. The Ninth Circuit has recognized that allegations arising from a bank's lending relationship, repeated extensions of credit, monitoring of the borrower's financial condition, continued lending despite defaults, and atypical banking practices can support an inference of actual knowledge of a customer's Ponzi scheme. (*See* Exh. 15.)

**E. The October 2017 JJMT Investigation Gave CNB Actual Knowledge of the Ponzi Scheme.**

184. CNB acquired actual knowledge of the Horwitz and 1inMM Ponzi scheme no later than October 2017, when Horwitz's explanation of his business directly contradicted CNB's records. That month, CNB investigated large, round-number transfers between 1inMM Capital account #0290 and JJMT Capital's Chase account. JJMT was Horwitz's largest source of investor funds, and the same circular transfer pattern predated and continued after the investigation. (*See* Exh. 3.)

185. Discovery may show whether CNB communicated with Chase about the JJMT transactions. But CNB's own records already showed that JJMT was not a film-rights purchaser, licensee, or legitimate lender repaid from business revenue; it was an investor aggregator whose funds repeatedly moved into and out of 1inMM Capital through circular transfers.

186. CNB's review focused on September 2017 transfers between 1inMM Capital and JJMT. CNB told Horwitz that 1inMM Capital was "being reviewed for the wires to and from JJMT Capital, LLC in the month of September 2017." (*See* Exh. 1.) Exhibit 3 shows that the underlying September 2017 records included nineteen incoming wires totaling approximately $16.18 million and twelve outgoing wires totaling approximately $10.67 million. (*See* Exh. 3.)

187. Those transactions did not fit Horwitz's stated business model under which CNB would have expected acquisition, revenue, and repayment activity. As part of the investigation,

CNB confronted Horwitz and asked him to explain the JJMT transactions. On October 24, 2017, Horwitz gave CNB the same film-rights financing story that he had used to solicit Plaintiffs and the Class:

> JJMT Capital is our (1inMM Productions and Rogue Black) financing partner for the bulk of our film distribution and finance deals. They (JJMT) provide debt financing in the form of loans (usually 6–12 months) to acquire the distribution rights to our films and 3rd party films that we license and distribute in Latin America and Europe. We sell our films to Netflix, HBO, SONY, etc. in the specific territories. September was a particularly heavy month because we licensed multiple films, added a territory in Europe and their previous loans that were made early this year had come full term... indicating the re-payment.

(Exh. 1.)

188. In substance, Horwitz told CNB that JJMT financed film-rights acquisitions, 1inMM used the funds to buy films, 1inMM generated revenue by licensing or selling rights to Netflix, HBO, and Sony, and the outgoing wires to JJMT repaid matured financing obligations. But CNB's own records for September 2017 flatly contradicted Horwitz's explanation. Account #0290 never showed any film-rights acquisition or licensing activity; it showed investor funds entering the enterprise and being redistributed to investors, Aggregators, commission recipients, Horwitz, related parties, and CNB itself.



189. CNB therefore knew by October 2017 that Horwitz's explanation was not true. It knew what investors were being told and knew from its own records that the account activity did not support Horwitz's claims about his business. Plaintiffs allege that CNB nevertheless continued assisting the scheme instead of terminating the relationship or restricting the account activity.

190. CNB also had entertainment-finance expertise that made Horwitz's explanation implausible. Vice President Mallon, who serviced Horwitz's accounts, understood legitimate film-finance transaction patterns. By October 2017, CNB had both the industry expertise and account-level information needed to determine that Horwitz's answer did not match the records CNB was reviewing.

191. Horwitz's October 2017 explanation also conflicted with statements made by Horwitz just weeks earlier. In September 2017, Horwitz described two wires from JJMT as payments "for the licensing of distribution rights to 2 of our films," implying that JJMT was buying film rights rather than lending 1inMM Capital money to buy them. Then, in October, Horwitz described JJMT as a lender financing 1inMM's acquisition of film rights from third parties and receiving repayment as loans matured. CNB therefore received inconsistent explanations about the same relationship and similar circular transactions within weeks.

192. After CNB questioned the September 2017 wires, Horwitz sought to stop all similar inquiries. He wrote to CNB:

> The confirmation email may have been a one time thing but I just received an email from Donna... inquiring about 2 wires from yesterday. Just want to make sure that this is not a regular occurrence as we do a number of wires weekly.

193. CNB did not escalate, restrict transactions, require documentation, or terminate the accounts. Instead, a CNB account manager replied: "The wire notices are just a courtesy. I

have asked Donna not to send them." Horwitz responded, "Great - you're the best," and the manager replied, "My pleasure. Glad to be of service." That exchange supports the inference that, after questioning unusual JJMT transfers and receiving inconsistent explanations, CNB reduced future inquiries instead of increasing scrutiny. (*See* Exh. 1.)

194. The October 2017 investigation provided more than a generalized red flag. It tested Horwitz's explanation against CNB's business records, which showed that the credits and debits needed to support his story did not exist. The significance of that discovery was reinforced in July 2018, when Chase Bank terminated JJMT's banking relationship because of its dealings with Horwitz and gave JJMT sixty days to move accounts that were receiving millions in new investor funds each month.

195. In response to losing its bank in the summer of 2018, JJMT sought to open a CNB account. CNB declined to start a deposit relationship with JJMT. Plaintiffs do not allege that refusal was wrongful. It matters because CNB refused JJMT while continuing to maintain and service the Horwitz and 1inMM accounts, the scheme's financial hub. That 2018 refusal supports Plaintiffs' allegation that the 2017 investigation led CNB to conclude that JJMT was not a legitimate film-rights lender and that 1inMM Capital was not a legitimate film-rights buyer using funds borrowed from JJMT's investors. By October 2017, CNB knew that:

a. investors sent large, round-number wires into 1inMM Capital through JJMT and other aggregators;

b. 1inMM Capital sent large, round-number wires back to those same sources;

c. JJMT sent investor money directly to Horwitz's personal CNB account #5270;

d. Horwitz claimed the flows reflected film-rights financing and repayment from sales or licenses to HBO, Netflix, Sony, and similar counterparties;

e. CNB's records showed no matching payments to film-rights owners;

f. CNB's records showed no matching revenue from HBO, Netflix, Sony, or any legitimate film-rights counterparty;

g. CNB's records showed no operating activity consistent with Horwitz's stated business;

h. investor money, including funds routed through JJMT, was being used to repay earlier investors and related parties; and

i. CNB's credit exposure to Horwitz was being repaid with investor deposits, not legitimate business revenue. (*See* Exh. 1.)

196. October 2017 is therefore the latest possible date by which CNB acquired actual knowledge of the Ponzi scheme.

**F. Additional Facts Support the Inference That CNB Knew the Details of the Scheme Before October 2017.**

197. Although banks rarely admit actual knowledge of a customer's Ponzi scheme, the objectively verifiable facts known by CNB before October 2017 support the reasonable inference of earlier knowledge. They show that the 2017 investigation was the culmination of years of CNB employee review of detailed financial information from CNB accounts, the lending relationship, mandatory enhanced due-diligence reviews, and face-to-face customer interactions.

198. The mismatch between reality and Horwitz's explanation grew as the scheme expanded, as Ponzi schemes generally do. Investor deposits into 1inMM Capital accounts rose from approximately $465,000 in 2013, to $2.88 million in 2014, to $9.26 million in 2015, and to

$34.97 million in 2016, without corresponding film-rights purchases, studio revenue, licensing revenue, or ordinary business expenses. (*See* Exh. 4.)

199. CNB's lending records showed the same pattern. LOC advances rose from approximately $3 million in 2014 to $10.1 million in 2015 and $13.2 million in 2016. CNB's records showed those advances moving from the LOC to Horwitz's personal account #5270, then the same day to 1inMM Capital account #0290, before being sent to investors through JJMT the same day or shortly thereafter. The loan proceeds were used for investor-related payments, not personal expenses or film-rights transactions. (*See* Exhs. 1, 8, 9.)

200. By early 2016, CNB was reviewing sharply rising investor deposits and LOC borrowing, but no real film-rights business. Investor money and CNB credit kept payments current, and the absence of legitimate revenue made the repayment source apparent: newer investors or CNB credit, not HBO, Netflix, Sony, or any real film-rights counterparty.

201. CNB's enhanced due diligence and ongoing account reviews confirmed the same point: the growth reflected more investor inflows, payment pressure, and CNB credit—not legitimate revenue-generating activity.

202. The August 2017 Deadline Magazine exchange also supports earlier knowledge. On or about August 18 and 21, 2017, reporter Anita Busch of Deadline Magazine asked CNB about 1inMM's proof of funds, a related credit facility, and how 1inMM raised money for purported film-rights acquisitions. CNB relayed the inquiry to Horwitz and told him it confirmed that 1inMM had accounts in good standing and sufficient funds to cover $5,000,000 but was "not able to confirm how funds were raised."

203. Horwitz's response showed why that question mattered: he thanked CNB for not disclosing "the 'how funds were raised' question" and said he could not believe Busch had

asked it. CNB thus knew an entertainment-industry reporter had focused on 1inMM's funding source and that Horwitz viewed the topic as problematic.

204. The topic was problematic because CNB's records showed the funds came from investors, aggregators, internal transfers, and CNB credit—not film-rights sales to HBO, Netflix, Sony, or any legitimate counterparty. CNB's confirmation of available funds while declining to explain their source supports the inference that CNB knew before October 2017 that 1inMM's funding did not match Horwitz's film-rights story told to the press. (*See* Exh. 1.)

205. CNB also had reason to recognize Ponzi-scheme risk from prior litigation involving another alleged Ponzi scheme using CNB's accounts. Plaintiffs do not rely on that litigation to establish liability; the current claim rests on CNB's October 2017 investigation and post-knowledge assistance. But the prior experience reinforces that CNB understood the key signs of an operational Ponzi scheme. CNB's overdraft and NSF reviews provided another warning. Despite massive investor inflows, Horwitz-related accounts repeatedly lacked funds for checks, transfers, or wires; by August 16, 2016, they had generated at least 87 NSF or overdraft events. (*See* Exhs. 10, 17.)

206. Those events were inconsistent with a successful film-rights business. A legitimate enterprise generating millions from major counterparties would not repeatedly need emergency account coverage, internal transfers, or CNB credit to prevent payment failures.

207. Each overdraft or NSF event required CNB to review balances, recent credits and debits, and the customer's ability to cure. Those reviews repeatedly showed shortfalls covered by investor money, internal transfers, or CNB credit—not legitimate business revenue. (*See* Exhs. 1, 10.)

208. The circular flow was visible before October 2017: CNB saw LOC funds move through Horwitz's personal account into 1inMM-related accounts and then to investors or investor-related recipients. (*See* Exhs. 1, 6, 8, 9.) CNB also saw investor money flow back through the same accounts to repay CNB.

209. That flow gave CNB an earlier view of the facts later made unavoidable: no film-rights purchases, no HBO, Netflix, or Sony revenue, no legitimate business activity explaining the payments—only investor deposits, bank credit, recycled payments, and repayments to CNB.

210. These pre-October 2017 facts do not replace Plaintiffs' central allegation that CNB had actual knowledge no later than October 2017; they support it. By the time CNB investigated JJMT, CNB had years of account records, lending records, due-diligence reviews, entertainment-industry expertise, overdraft reviews, and the Deadline inquiry showing activity inconsistent with Horwitz's claimed business.

211. Accordingly, even if October 2017 is treated as the latest date of actual knowledge, the earlier records support the inference that CNB knew sooner. CNB's knowledge was not the product of one isolated investigation, but of years of reviews showing the same pattern: investor money and bank credit flowing through the enterprise without legitimate revenue-generating activity.

**G. After October 2017, CNB Substantially Assisted the Scheme.**

212. By October 2017, CNB knew Horwitz and 1inMM were operating a Ponzi scheme through CNB accounts, yet it did not close the accounts, end the relationship, stop transactions, restrict unusual activity, refuse credit, or take other steps that would have impaired the scheme. Instead, CNB continued providing the accounts, transaction processing, credit, overdraft cures, a proof-of-funds letter, and late-stage transfers the scheme needed. That

assistance was substantial: after acquiring actual knowledge, CNB supplied the banking infrastructure Horwitz needed to maintain investor confidence, avoid payment failures, and continue raising funds, causing most of the Net Losers' losses. CNB's post-knowledge assistance was not merely passive inaction or a failure to discover fraud. After CNB knew the represented film-rights business was false, each category of assistance helped Horwitz avoid payment failures, preserve investor confidence, delay collapse, and continue raising, retaining, recycling, or dissipating investor money.

1. <u>CNB Maintained the Accounts and Continued Processing Investor-Related Transactions.</u>

213. After October 2017, CNB continued maintaining the Horwitz and 1inMM accounts, receiving investor deposits, processing transfers to investors and related recipients, and reviewing related account activity. Those services kept 1inMM operating and appearing legitimate; without them, Horwitz's ability to receive funds, make lulling payments, and preserve that appearance would have been materially impaired. That processing was essential to the continuation of the scheme because 1inMM needed the CNB accounts both to receive new investor money and to send payments that made earlier investors believe the represented film-rights business was performing. Each successful deposit, transfer, and investor-related payment helped postpone the payment failures that would have exposed the fraud, thereby allowing additional investor money to enter, remain in, or be dissipated by the enterprise after October 2017.

2. <u>CNB Continued Extending Credit and Tolerating Overdrafts.</u>

214. After October 2017, CNB continued maintaining and renewing the LOC, allowing Horwitz to use CNB credit to cover shortfalls and make timely payments when investor funds were unavailable or insufficient. CNB also allowed overdrafts and shortfalls to be

cured when the scheme was most vulnerable. By continuing to provide credit, cures, and payment processing despite recurring liquidity pressure, CNB supplied liquidity needed to keep the scheme operating after October 2017. The LOC and overdraft accommodations functioned as bridge liquidity for the Ponzi scheme. When incoming investor money was unavailable, delayed, or insufficient, CNB credit and account accommodations allowed Horwitz to make payments that otherwise would have failed. Those successful payments concealed the enterprise's insolvency, reassured investors and Aggregators, and allowed the scheme to continue long enough for additional investor funds to be raised, retained, recycled, and dissipated.

3. <u>CNB Issued a Misleading Proof-of-Funds Letter.</u>

215. In February 2019, CNB issued a misleading proof-of-funds letter confirming a $4.5 million balance in a 1inMM-related account, despite knowing the balance was temporary. The account held only $1,094.12 on February 7 before receiving five transfers on February 8 totaling $4,499,000, each just under $1 million. After the letter was written, the balance was quickly depleted: Horwitz transferred $3,206,980 out the next business day and another $1,240,000 about a week later, leaving a minimal balance, as shown below. (*See* Exh. 1.)




216. By confirming $4.5 million under those circumstances, CNB helped support Horwitz's misleading public presentation of available funds. The proof-of-funds letter mattered because the scheme depended on the appearance of liquidity. CNB's confirmation gave Horwitz

bank-backed credibility at a time when the account balance was the product of temporary transfers rather than legitimate film-rights revenue. By confirming the temporary balance without disclosing the surrounding account activity known to CNB, the bank helped Horwitz preserve confidence in the enterprise and avoid the loss of trust that would have accelerated the scheme's collapse.

4. <u>CNB Assisted Late-Stage Transfers as the Scheme Collapsed.</u>

217. By late 2019, the scheme faced mounting payment pressure: investor complaints were increasing, new investor funds were harder to obtain, and Horwitz had largely exhausted his available borrowing capacity at the bank. During that period, CNB continued moving funds through Horwitz-related accounts, including an MJLZ Trust account for which attorney Leslie Klinger was a signatory.

218. On December 26, 2019, attorney Klinger instructed CNB to move funds on an "immediate" basis. That same day, Horwitz told CNB he needed trust funds transferred into 1inMM Capital as soon as they arrived and asked CNB to ensure there was no delay. Horwitz specifically directed CNB to transfer $3,009,627 from the trust account into 1inMM Capital account #0290 immediately upon receipt. CNB complied. The transfer was unrelated to any legitimate film-rights acquisition or revenue activity; it helped Horwitz move available funds into 1inMM as the scheme struggled to meet payment obligations.

219. On January 13, 2020, CNB followed Horwitz's further instructions to transfer $250,000 into his personal account and to send account statements directly to him rather than to Klinger. CNB's compliance helped Horwitz move and control funds during the scheme's final stages and reduced the visibility of a signatory who otherwise had access to trust account information and statements. (*See* Exh. 1.)

220. Those late-stage transfers were substantial assistance because they occurred when the scheme was under acute liquidity pressure. By continuing to move funds through Horwitz-related accounts at that point, CNB helped Horwitz respond to urgent cash demands, delay default, and continue concealing that the enterprise had no legitimate film-rights revenue. The transfers therefore did not merely process historic activity; they helped preserve the scheme during the period when additional investor losses were being created and existing investor money was being dissipated.

221. CNB's post-knowledge assistance caused or contributed to Plaintiffs' and Class Members' losses because the scheme depended on continued banking access, credit, liquidity support, and payment processing. Had CNB closed or restricted the accounts, refused further credit, stopped accommodating shortfalls, or declined to provide misleading account confirmations after acquiring actual knowledge, Horwitz's ability to receive new funds, make lulling payments, and maintain the appearance of a functioning film-rights business would have been materially impaired. Instead, CNB's continued support allowed the scheme to continue, which caused investor money after October 2017 to be invested, retained, recycled, routed through, or dissipated by the 1inMM enterprise.

**H. CNB's Later Conduct Corroborates Its Knowledge and Volition.**

222. CNB's 2019 and 2020 conduct does not create a separate claim. It is alleged as corroborative evidence of CNB's knowledge, volition, and understanding of its own records. By late 2019 and early 2020, CNB's records already showed the actual use of the LOC, the source of repayment, the absence of legitimate film-rights revenue, and the recycling of investor money through the Horwitz and 1inMM accounts.

223. On February 3, 2020, after investor money had stopped flowing into the scheme, CNB asked Horwitz to explain the use of loan proceeds for the LOC advances. CNB wrote: "Our credit policy has been updated, and we are now required to obtained [sic] details of the loan purpose. In the past, 'personal expenses' was sufficient however, we are now required to get the true loan purpose." (*See* Exh. 1.)

224. That request did not mark the first time CNB had reason to know the true use of LOC proceeds. For years before February 2020, CNB had advanced money through the LOC, recorded the advances, reviewed repayments, renewed the credit relationship, and maintained the accounts showing where the money went and how CNB was repaid.

225. By February 3, 2020, CNB had been in the lending relationship for approximately seven years, had approved multiple LOC renewals, had advanced approximately $64 million to Horwitz, and had been repaid approximately $63 million through accounts funded by defrauded investors. CNB had made at least 456 extensions of credit to Horwitz totaling approximately $64.23 million, and its business records showed repeated large same-day or near-same-day draws and repayments moving through the linked CNB accounts that CNB maintained, monitored, and reviewed. (*See* Exhs. 1, 8.)

226. CNB's own records also showed that the LOC proceeds were not being used for ordinary personal expenses. They showed funds moving from LOC account #9641 through Horwitz Personal Account #5270 and 1inMM-related accounts to investors and investor-related recipients. They also showed investor money moving back through those same accounts to repay or replenish CNB's credit exposure.

227. The February 3, 2020 request for the "true loan purpose" therefore supports the inference that CNB understood the importance of the LOC's stated purpose, the actual

movement of funds, and the risk that its own records would expose the facility's true use. The same records showed that Horwitz did not operate even a small legitimate film-rights business that could explain the account activity. He did not buy film rights, and he did not receive revenue from HBO, Netflix, Sony, or any other legitimate film-rights counterparty. CNB knew those facts from the records alleged above.

228. CNB's late-2019 and early-2020 handling of trust-account transfers supports the same inference. As the scheme came under payment pressure, CNB followed urgent instructions to move funds into 1inMM Capital and then changed account-statement delivery so that statements would be sent directly to Horwitz rather than to the lawyer signatory who previously had access to them. Those facts corroborate CNB's knowledge and volition because they show CNB continuing to assist Horwitz's movement and control of funds after its own records had long reflected the true nature of the scheme.

229. When the scheme collapsed in April 2021, CNB's account records already showed the use of LOC proceeds, the source of repayment, the absence of legitimate film-rights revenue, and the recycling of investor money through CNB accounts. CNB's 2019 and 2020 conduct supports the inference that CNB understood those facts before the collapse and acted accordingly.

## IX. CLASS ACTION ALLEGATIONS

230. Plaintiffs reallege all foregoing paragraphs as if set forth fully herein. Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23.

### A. Class Definition.

231. Plaintiffs seek certification of the following Class:

> All natural and legal Persons who suffered net losses from money deposited with City National Bank intended to be invested in the 1inMM Capital film finance enterprise after CNB acquired actual knowledge of the fraud committed by Horwitz on investors.

232. Included in the class of Net Losers are assignees of members of the Class. Excluded from the Class are: Defendant City National Bank; any person or entity related to, owned by, or controlled by CNB; Horwitz; the 1inMM Entities; any person or entity related to, owned by, or controlled by Horwitz or the 1inMM Entities; any person or entity that knowingly participated in or assisted the fraud; JJMT, Movie Fund, SAC-related entities, Vausse Films, Pure Health, any other aggregator with knowledge of the fraud, and the principals of any such aggregator; the Court, its staff, and their immediate family members; and any person or entity whose total repayments from the 1inMM enterprise equaled or exceeded the total amount invested, i.e., 'Net Winners.'

233. "Person" includes natural persons, entities, representatives, successors, and assignees.

**B. Numerosity.**

234. The Class is so numerous that joinder of all members is impracticable. The 1inMM scheme involved hundreds of Net Loser investors whose money was invested in, deposited into, routed through, retained by, recycled through, or dissipated by the 1inMM enterprise after CNB acquired actual knowledge of the fraud and of facts showing that investor money had been obtained by fraud, regardless of the original investment date.

235. The identities of Class Members can be determined from common records, including investor records, receivership records, bank records, aggregator records, sub-feeder records, wire records, payment records, and loss schedules. Class Members are geographically dispersed, including persons and entities located outside California. Individual joinder would be

impracticable, inefficient, and unnecessary given the common proof applicable to CNB's knowledge, CNB's assistance, the continuation of the scheme after October 2017, and classwide damages. (*See* Exh. 2.)

**C. Commonality and Predominance.**

236. Common questions of law and fact exist and predominate over individual questions. Those common questions include, among others:

a. whether Horwitz and the 1inMM Entities operated a fraud by representing that investor money would be used to acquire film-distribution rights for profitable resale or licensing;

b. whether investor money was instead used to pay earlier investors, aggregators, commission recipients, Horwitz, related parties, CNB, and other expenses unrelated to any legitimate film-rights business;

c. whether 1inMM received legitimate revenue from HBO, Netflix, Sony, or any similar film-rights purchaser or licensee;

d. whether CNB's account records, wire records, transaction-detail reports, overdraft records, and lending records showed the absence of legitimate film-rights purchases and revenue;

e. whether CNB acquired actual knowledge of the fraud no later than October 2017;

f. whether CNB acquired actual knowledge earlier than October 2017;

g. whether CNB substantially assisted the fraud after acquiring actual knowledge;

h. whether CNB substantially assisted the fraudulent concealment of material facts from Plaintiffs and the Class;

i. whether CNB's continued account maintenance, wire processing, LOC lending and renewals, overdraft handling, a proof-of-funds letter, and late-stage transfer assistance allowed the scheme to continue;

j. whether Plaintiffs' and Class Members' money was obtained by Horwitz and the 1inMM Entities in a manner constituting theft;

k. whether CNB received, concealed, withheld, or aided in concealing or withholding investor money after knowing it had been obtained by fraud;

l. whether CNB received investor money for its own benefit through repayment or replenishment of CNB's credit exposure, interest, fees, overdraft exposure, or other amounts owed to or received by CNB;

m. whether Plaintiffs and Class Members are entitled to treble damages, costs, and reasonable attorneys' fees under California Penal Code § 496(c);

n. whether CNB's conduct caused or contributed to Plaintiffs' and Class Members' losses;

o. whether Plaintiffs and Class Members suffered damages measurable through common proof; and

p. whether Plaintiffs and Class Members are entitled to punitive damages, prejudgment interest, costs, or other relief.

237. These questions are capable of classwide answers because they concern CNB's common course of conduct, CNB's knowledge, CNB's records, CNB's banking services, CNB's lending relationship, the same Ponzi scheme, the same represented film-rights business, and the

same alleged knowing receipt, retention, concealment, withholding, or assistance in concealing or withholding investor money obtained by fraud. The evidence relevant to those questions will come principally from common sources, including CNB records, receiver records, investor records, aggregator records, wire records, transaction-detail reports, account statements, LOC records, communications, and expert analysis.

238. Individual issues, if any, do not predominate. The principal issues are whether CNB knew of the fraud, substantially assisted its continuation after October 2017, and knowingly received, retained, concealed, withheld, or assisted in concealing or withholding investor money obtained by fraud. Those issues are common to the Class and do not depend on individualized proof from each Class Member.

239. Damages also can be proven through common or formulaic evidence. Class Members' net losses can be calculated by comparing amounts invested in, retained by, recycled through, routed through, or dissipated by the 1inMM enterprise after CNB acquired actual knowledge, regardless of the original investment date, against amounts returned to each Class Member. Those calculations can be made using common investor records, receivership records, aggregator records, wire records, payment records, and expert analysis.

**D. Typicality.**

240. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and Class Members invested in the same represented 1inMM film-rights business, were exposed to the same Ponzi scheme, suffered net losses from money invested in, retained by, recycled through, routed through, or dissipated by the 1inMM enterprise after CNB acquired actual knowledge, and seek to hold CNB liable for the same course of knowing assistance and the same post-

knowledge receipt, retention, concealment, withholding, or assistance in concealing or withholding investor money obtained by fraud.

241. Plaintiffs' claims arise from the same factual and legal theories as the claims of the Class: that Horwitz and the 1inMM Entities defrauded investors, that CNB had actual knowledge of the fraud no later than October 2017, that CNB substantially assisted the scheme after acquiring actual knowledge, that CNB received, retained, concealed, withheld, or assisted in concealing or withholding investor money after knowing it had been obtained by fraud, and that Plaintiffs and Class Members were damaged by the scheme's continued operation.

242. Any factual differences among Plaintiffs and Class Members, including the specific aggregator, feeder, sub-feeder, investment date, amount invested, amount returned, or net-loss amount, do not defeat typicality. Those differences do not alter the central common issues concerning CNB's knowledge, CNB's assistance, causation, and damages.

**E. Adequacy.**

243. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are Net Loser investors whose interests are aligned with the Class. They seek the same relief as other Class Members: recovery of losses caused by CNB's knowing assistance of Horwitz's fraud after CNB acquired actual knowledge and by CNB's alleged post-knowledge receipt, retention, concealment, withholding, or assistance in concealing or withholding investor money obtained by fraud, including losses from money invested in, retained by, recycled through, routed through, or dissipated by the 1inMM enterprise after that date and statutory relief under California Penal Code § 496(c).

244. Plaintiffs do not have interests antagonistic to or in conflict with the Class. Plaintiffs have participated in the investigation and prosecution of this action, understand their

responsibilities as proposed class representatives, and are willing to continue representing the Class.

245. Plaintiffs' counsel are adequate to represent the Class. Counsel have experience investigating and prosecuting complex civil litigation, fraud claims, financial-institution liability claims, class actions, and investor-loss cases. Counsel have devoted substantial time and resources to investigating the 1inMM scheme, CNB's role, the relevant banking records, the receivership materials, and the legal claims asserted here. Counsel will fairly, adequately, and vigorously represent the interests of the Class.

**F. Superiority and Manageability.**

246. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. The claims of individual Class Members arise from the same Ponzi scheme, the same CNB accounts, the same alleged actual knowledge, the same post-knowledge banking assistance, the same alleged receipt, retention, concealment, withholding, or assistance in concealing or withholding investor money obtained by fraud, and the same common course of conduct.

247. Individual actions would be inefficient, costly, and impractical. Many Class Members' individual losses, while substantial to them, may be too small to justify separate complex litigation against a national bank involving extensive banking records, expert analysis, receivership materials, and common proof of knowledge and substantial assistance. Separate actions would also risk inconsistent rulings on the same core questions.

248. Class treatment is manageable. Class membership can be determined from common records, including investor records, receivership records, aggregator records, wire records, payment records, and loss schedules. The amount invested, amount returned, timing of

payments, and net-loss amount for each Class Member can be calculated from those same records.

249. The central liability issues can be tried using common proof. Those issues include the existence of the Ponzi scheme, CNB's actual knowledge, CNB's account records, CNB's lending and repayment records, CNB's wire and overdraft reviews, CNB's continued post-knowledge banking services, CNB's substantial assistance, CNB's receipt, retention, concealment, withholding, or assistance in concealing or withholding investor money obtained by fraud, and the causal relationship between CNB's conduct and the continuation of the scheme.

250. Any individualized issues concerning tracing, net-loss calculation, or allocation of damages can be managed through common records, subclasses if necessary, claims administration procedures, expert analysis, special-master procedures, or other case-management tools. Those issues do not predominate over the common questions and do not make the case unmanageable.

251. Concentrating the litigation in this Court is appropriate because CNB is headquartered in Los Angeles, relevant CNB banking activity occurred in this District, the Receiver's action against CNB was filed in this District, and common records and witnesses are likely to be located in or connected to this District.

252. For these reasons, certification under Rule 23 is appropriate.

## X. CLAIMS FOR RELIEF

253. Plaintiffs do not seek to impose liability on CNB for petitioning activity, litigation conduct, public statements, reports to government authorities, or participation in any judicial, regulatory, receivership, or law-enforcement proceeding. Those matters are alleged

only where relevant to discovery, notice, knowledge, intent, or context, and are not alleged as an independent basis for liability or damages. Plaintiffs' claims arise from CNB's commercial banking conduct after it acquired actual knowledge of the fraud, including maintaining accounts, processing investor-related transactions, extending and renewing credit, accommodating overdrafts and shortfalls, issuing private commercial banking confirmations, and assisting transfers that allowed the scheme to continue. Plaintiffs' Penal Code § 496 claim likewise arises from CNB's commercial banking conduct after actual knowledge, including CNB's knowing receipt, retention, concealment, withholding, or assistance in concealing or withholding investor money obtained by fraud. Plaintiffs do not seek to impose § 496 liability based on CNB's petitioning activity, litigation conduct, regulatory reports, or participation in judicial, regulatory, receivership, or law-enforcement proceedings. Plaintiffs do not seek to impose liability based on a generalized duty to monitor non-customers; Plaintiffs seek liability based on CNB's alleged actual knowledge of Horwitz's fraud and CNB's affirmative commercial banking assistance after that knowledge.

**A. Aiding and Abetting Fraud.**

254. Plaintiffs reallege the foregoing paragraphs as if set forth fully herein.

255. Horwitz and the 1inMM Entities committed fraud. They represented to Plaintiffs and Class Members that investor money would be used to acquire film-distribution rights for profitable resale or licensing to legitimate counterparties, including HBO, Netflix, Sony, and similar entities. Those representations were false. Horwitz and the 1inMM Entities did not operate a legitimate film-rights business, did not use investor money as represented, and did not repay investors from legitimate film-rights revenue.

256. Horwitz and the 1inMM Entities intended investors to rely on those false representations. Plaintiffs and Class Members reasonably relied on them by investing money, directly or indirectly, in the 1inMM enterprise. Reliance may be proven through common evidence because the same core misrepresentations and concealed facts went to the fundamental nature of the investment: whether investor money was being used for legitimate film-rights transactions or for a Ponzi scheme. Plaintiffs and Class Members were harmed when their money was lost, retained, recycled, or dissipated in the Ponzi scheme.

257. CNB had actual knowledge of the fraud no later than October 2017, when it investigated the circular JJMT transactions, obtained Horwitz's false film-rights explanation, and possessed records showing no film-rights purchases, no revenue from HBO, Netflix, Sony, or similar counterparties, and no operating activity consistent with Horwitz's claimed business.

258. Additional facts support an inference of earlier knowledge, including CNB's due diligence, entertainment-banking oversight, transaction and wire reviews, overdraft reviews, LOC underwriting and renewals, source-of-repayment reviews, and repeated observation of circular fund flows. Plaintiffs need not prove earlier knowledge because CNB had actual knowledge no later than October 2017.

259. After acquiring actual knowledge, CNB substantially assisted the fraud by maintaining the Horwitz and 1inMM accounts, processing investor-related transactions, extending and renewing credit, tolerating or covering overdrafts, issuing a misleading proof-of-funds letter, and assisting late-stage transfers as the scheme faced payment pressure.

260. That assistance was substantial because CNB's accounts, wires, credit, overdraft handling, a proof-of-funds letter, and late-stage transfers helped the scheme receive investor money, make lulling payments, preserve apparent legitimacy, and continue operating. CNB

supplied the banking functions the Ponzi scheme needed after actual knowledge: accounts to receive investor funds, transaction processing to make lulling and investor-related payments, credit and overdraft accommodations to cover liquidity shortfalls, a proof-of-funds letter to support misleading appearances of liquidity, and late-stage transfer assistance as the scheme came under increasing pressure. That assistance allowed Horwitz and the 1inMM Entities to continue raising investor money until new money stopped flowing, and thereafter to continue retaining, recycling, concealing, withholding, and dissipating investor money.

261. CNB's assistance caused harm to Plaintiffs and the Class. After CNB acquired actual knowledge no later than October 2017, Horwitz and the 1inMM Entities continued raising investor money until new money stopped flowing, and thereafter continued retaining, recycling, and dissipating investor money. CNB's continued assistance allowed the scheme to continue and caused or contributed to the losses suffered by Plaintiffs and Class Members.

262. Plaintiffs and Class Members suffered damages in amounts to be proven at trial, including their net losses from money invested, retained, recycled, or dissipated after CNB acquired actual knowledge of the fraud.

263. CNB's conduct was knowing, intentional, willful, fraudulent, malicious, and oppressive. CNB knowingly provided banking services and credit support to a Ponzi scheme after learning that the represented film-rights business did not exist. CNB's conduct was undertaken, authorized, or ratified by officers, directors, managing agents, or employees acting with sufficient authority to bind CNB.

264. Plaintiffs and Class Members are therefore entitled to compensatory damages, punitive damages, prejudgment interest, costs, and all other relief permitted by law.

**B. Aiding and Abetting the Fraudulent Concealment of a Material Fact.**

265. Plaintiffs reallege the foregoing paragraphs as if set forth fully herein.

266. Horwitz and the 1inMM Entities fraudulently concealed material facts from Plaintiffs and the Class. Horwitz did not merely remain silent. He and the 1inMM Entities affirmatively solicited investor money by representing that investor funds would be used to acquire film-distribution rights and that investor principal and returns would be paid from legitimate resale or licensing transactions with counterparties such as HBO, Netflix, Sony, and similar entertainment companies.

267. Having made those affirmative representations, Horwitz and the 1inMM Entities had a duty to disclose facts necessary to prevent those representations from being misleading. Horwitz and the 1inMM Entities also had exclusive or superior knowledge of the concealed facts: that the represented film-rights business did not exist, that investor money was not being used to acquire film-distribution rights, that 1inMM was not receiving revenue from HBO, Netflix, Sony, or any similar counterparty, and that investor money was instead being recycled to make payments to earlier investors, aggregators, commission recipients, Horwitz, related parties, and CNB.

268. The material facts concealed from Plaintiffs and the Class included, among others:

a. that Horwitz and the 1inMM Entities were operating a Ponzi scheme;

b. that 1inMM was not using investor money to acquire film-distribution rights for profitable resale or licensing;

c. that 1inMM was not receiving revenue from HBO, Netflix, Sony, or any other legitimate film-rights purchaser or licensee;

d. that investor payments were being made from new investor money, CNB credit, or funds recycled through Horwitz-related accounts, rather than from legitimate film-rights revenue;

e. that CNB credit was being used to help make investor-related payments when new investor money was insufficient or delayed;

f. that investor money was being used, in part, to repay or replenish CNB's credit exposure; and

g. that the 1inMM enterprise had no legitimate operating business capable of generating the promised returns.

269. Those facts were material. A reasonable investor would consider it important to know that the investment was not supported by actual film-rights purchases, studio revenue, or legitimate business operations, but instead depended on new investor money, recycled payments, and bank credit.

270. Plaintiffs and the Class did not know the concealed facts when they invested, retained investments, accepted lulling payments, refrained from demanding repayment, or otherwise remained exposed to the scheme. Plaintiffs and the Class reasonably relied on Horwitz's and 1inMM's affirmative representations and on the absence of any disclosure of the concealed facts. Had Plaintiffs and the Class known the concealed facts, they would not have invested, would not have allowed their money to remain exposed to the scheme, and would have acted to protect themselves from additional loss.

271. Reliance may be inferred on a classwide basis because the concealed facts went to the core of the investment. No reasonable investor would knowingly invest in, remain invested in, or permit money to be recycled through a Ponzi scheme once the investor knew that

the represented film-rights business did not exist and that payments were being made from new investor money and bank credit rather than legitimate revenue.

272. CNB had actual knowledge of Horwitz's fraudulent concealment no later than October 2017. In October 2017, CNB investigated the circular JJMT transactions, required Horwitz to explain those transactions, received Horwitz's film-rights financing explanation, and possessed account records showing that the explanation was false. CNB knew from its own records that 1inMM was not buying film rights, was not receiving revenue from HBO, Netflix, Sony, or similar counterparties, and was not operating the business Horwitz described to CNB and to investors.

273. CNB also knew that the omitted facts were not being disclosed to investors. The account records, TDRs, incoming wire descriptions, and Horwitz's October 2017 explanation showed CNB the investor-facing story: investors were being told that their money related to film-rights transactions. CNB's own records showed the opposite. CNB therefore knew that investors were being induced to provide money under a false film-rights narrative while the material facts revealing the Ponzi scheme were being concealed from them.

274. CNB was aware of its role in assisting the concealment when it continued providing banking services after acquiring actual knowledge. CNB knew that its accounts, wires, credit, overdraft handling, a proof-of-funds letter, and late-stage transfer assistance helped Horwitz and 1inMM continue receiving investor money, making lulling payments, maintaining the appearance of legitimacy, and concealing the absence of any real film-rights business. By continuing to process payments, supply liquidity, accommodate shortfalls, and confirm temporary account balances, CNB helped maintain the false appearance that 1inMM

was operating a legitimate film-rights business and that investor payments were supported by real film-rights revenue rather than new investor money, CNB credit, and recycled funds.

275. CNB substantially assisted the fraudulent concealment after acquiring actual knowledge. It maintained the Horwitz and 1inMM accounts, processed investor-related transactions, continued extending and renewing credit, tolerated or covered overdrafts and shortfalls, issued a misleading proof-of-funds letter, and assisted late-stage transfers as the scheme came under payment pressure.

276. CNB's assistance was substantial because the concealment depended on continued financial operation. A Ponzi scheme is exposed when it cannot receive new investor money, make timely lulling payments, or maintain the appearance of legitimate liquidity. CNB's continued services allowed Horwitz and 1inMM to continue doing so after CNB knew the represented business was false.

277. CNB's assistance caused harm to Plaintiffs and the Class. After CNB acquired actual knowledge no later than October 2017, Horwitz and the 1inMM Entities continued raising investor money until new money stopped flowing, and thereafter continued retaining, recycling, dissipating, and concealing investor money while concealing that the enterprise was a Ponzi scheme. CNB's continued assistance allowed the concealment and the scheme to continue and caused or contributed to Plaintiffs' and Class Members' losses.

278. Plaintiffs and Class Members suffered damages in amounts to be proven at trial, including their net losses from money invested, retained, recycled, or dissipated after CNB acquired actual knowledge of the fraudulent concealment.

279. CNB's conduct was knowing, intentional, willful, fraudulent, malicious, and oppressive. CNB knowingly provided banking services and credit support to Horwitz and the

1inMM Entities after learning that the represented film-rights business did not exist and that investors were not being told the truth. CNB's conduct was undertaken, authorized, or ratified by officers, directors, managing agents, or employees acting with sufficient authority to bind CNB.

280. Plaintiffs and Class Members are therefore entitled to compensatory damages, punitive damages, prejudgment interest, costs, and all other relief permitted by law.

**C. Violation of California Penal Code § 496.**

281. Plaintiffs reallege the foregoing paragraphs as if set forth fully herein.

282. Before filing this action, Plaintiffs' counsel notified CNB that Net Loser investors intended to assert class claims for their losses arising from CNB's alleged role in the Horwitz/1inMM Ponzi scheme; CNB denied liability, threatened sanctions, and declined to resolve the claims pre-suit.

283. California Penal Code § 496(a) prohibits any person from buying, receiving, concealing, selling, withholding, or aiding in concealing, selling, or withholding property that has been stolen or obtained in any manner constituting theft, knowing the property to have been stolen or so obtained.

284. Horwitz and the 1inMM Entities knowingly and designedly obtained Plaintiffs' and Class Members' money by fraud, false pretenses, and fraudulent concealment, with the intent to defraud investors. They represented that investor funds would be used to acquire film-distribution rights for profitable resale or licensing to legitimate counterparties, including HBO, Netflix, Sony, and similar entities. Those representations were false. The represented film-rights business did not exist. Investor money was not used as represented and was instead recycled through the 1inMM enterprise, used to make lulling payments, used to pay investors,

aggregators, commission recipients, Horwitz, related parties, and CNB, and dissipated for purposes unrelated to any legitimate film-rights business.

285. The money Horwitz and the 1inMM Entities obtained from Plaintiffs and Class Members was therefore property obtained in a manner constituting theft within the meaning of California Penal Code §§ 484 and 496.

286. CNB knowingly and intentionally received, retained, concealed, withheld, or aided in concealing or withholding stolen investor money after acquiring actual knowledge that the money had been obtained by Horwitz and the 1inMM Entities through fraud. Plaintiffs do not seek to impose liability on CNB merely because it maintained deposit accounts or processed ordinary banking transactions before acquiring actual knowledge. Plaintiffs' claim is based on CNB's knowing, intentional, and post-knowledge conduct, including CNB's receipt and retention of fraud proceeds for its own benefit and CNB's knowing assistance in moving, recycling, concealing, and withholding stolen investor money after CNB knew the represented film-rights business was false.

287. No later than October 2017, CNB knew that investor money flowing through the Horwitz and 1inMM accounts had been obtained by fraud. CNB investigated the circular JJMT transactions, required Horwitz to explain them, received Horwitz's film-rights financing explanation, and possessed account records showing that the explanation was false. CNB's records showed no legitimate film-rights purchases, no revenue from HBO, Netflix, Sony, or similar counterparties, no legitimate business activity consistent with Horwitz's representations, and instead showed investor deposits being recycled through Horwitz-related accounts.

288. CNB also knew from its lending and repayment records that investor money was being used to repay or replenish CNB's own credit exposure. CNB's records showed LOC

advances moving from LOC account #9641 through Horwitz's personal account #5270 and into 1inMM-related accounts for investor-related payments. CNB's records also showed investor money moving back through the 1inMM accounts and Horwitz's personal account to repay or replenish the LOC. CNB therefore knew that it was receiving stolen investor money for its own benefit, including through repayments of principal, interest, fees, overdraft exposure, and other amounts owed to or received by CNB.

289. After acquiring that knowledge, CNB continued maintaining the Horwitz and 1inMM accounts, processing investor-related transactions, extending and renewing credit, accommodating overdrafts and shortfalls, issuing a misleading proof-of-funds letter, and assisting late-stage transfers. That conduct allowed Horwitz and the 1inMM Entities to continue receiving, recycling, concealing, withholding, and dissipating investor money that had been obtained by fraud.

290. CNB's receipt, concealment, withholding, or assistance in concealing or withholding stolen investor money injured Plaintiffs and the Class. After CNB acquired actual knowledge no later than October 2017, Horwitz and the 1inMM Entities continued raising investor money until new money stopped flowing, and thereafter continued retaining, recycling, dissipating, and concealing investor money. CNB's post-knowledge conduct caused or contributed to Plaintiffs' and Class Members' net losses.

291. Plaintiffs and Class Members suffered damages in amounts to be proven at trial, including net losses from money invested in, retained by, recycled through, routed through, or dissipated by the 1inMM enterprise after CNB acquired actual knowledge.

292. Under California Penal Code § 496(c), Plaintiffs and Class Members are entitled to recover three times the amount of actual damages sustained, costs of suit, reasonable attorneys' fees, prejudgment and post-judgment interest, and all other relief permitted by law.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter judgment in their favor and against Defendant City National Bank and grant the following relief:

1. certifying this action as a class action under Federal Rule of Civil Procedure 23;
2. appointing Plaintiffs as Class representatives;
3. appointing Plaintiffs' counsel as Class counsel;
4. awarding Plaintiffs and the Class compensatory damages in an amount to be proven at trial, including net losses caused by CNB's knowing assistance in the fraud and fraudulent concealment and by CNB's violation of California Penal Code § 496;
5. awarding prejudgment and post-judgment interest to the fullest extent permitted by law;
6. awarding punitive damages in an amount sufficient to punish and deter CNB's knowing, intentional, willful, fraudulent, malicious, or oppressive conduct;
7. awarding Plaintiffs and the Class treble damages under California Penal Code § 496(c), without duplicative recovery;
8. awarding Plaintiffs and the Class their costs of suit;
9. awarding attorneys' fees and expenses, including reasonable attorneys' fees under California Penal Code § 496(c), and any other fees or expenses permitted by contract,

statute, common fund doctrine, substantial benefit doctrine, or other applicable law; and

10. awarding such other and further relief as the Court deems just and proper.

## XII. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 9, 2026

By: ______________________
Patrick C. Bageant

Robert L. Brace, CSBN 122240
Maria F. Elosu, CSBN 342086
LAW OFFICES OF ROBERT BRACE
1807 Santa Barbara Street
Santa Barbara, CA 93101
Telephone: (805) 886-8458
rlbrace@rusty.lawyer
mariaelosulaw@gmail.com

Michael P. Denver, CSBN 199279
DENVER LAW, P.C.
514 W. Pueblo St., Suite 101
Santa Barbara, CA 93105
Telephone: (805) 896-4967
mdenver@denverlawgroup.law

Patrick Bageant, CSBN 275135
HOLLYSTONE LAW
1775 W. State Street, No. 286
Boise, ID 83702
Telephone: (208) 596-5343
pbageant@hollystonelaw.com

*Attorneys for Plaintiffs and*
*all others similarly situated.*

## XIII. INDEX OF EXHIBITS

| Exhibit No. | Date or Dates | Topic and Summary of Contents |
|---|---|---|
| Exhibit 1 | 2024-2-16 | A complaint filed by the Receiver entitled *Vives v. City National Bank*, No. 2:24-cv-01317. Filed for public view on 2/16/2024. All of the following accounting exhibits come from the information and work product produced by the Receiver in Exhibit 1. |
| Exhibit 2 | 2021-4-5 | Declaration of Lorraine Peterson in Support of the SEC in Case # 2:21-CV-02927-CAS-GJSx entitled *SEC v. Horwitz*. |
| Exhibit 3 | 2017-10-24 | CNB bank business records reviewed for the October 2017 investigation of 1inMM Capital and JJMT included the September 2017 credits and debits in the 1inMM Capital Account 0290 Summary Statement and Transaction Detail Reports showing: 19 incoming wire transfers from JMMT Capital, totaling $16,183,275 in new investor funds and 12 outgoing wire transfers to JJMT Capital totaling $10,672,895 to pay prior investors. |
| Exhibit 4 | 2013 to 2019 | A summary accounting of all deposits totaling $710,489,295.50 of investors' funds transferred to City National Bank. Most of the stolen money was deposited into the two 1inMM Capital bank accounts (Acct. Nos. 0290 and 2944) |
| Exhibit 5 | 2013 to 2021 | Flow of funds from business accounts to his Personal Account 5270. Exhibit 5 is an accounting of all transfers from Horwitz business accounts to his Personal Account 5270. Horwitz received $111 million in 313 transfers through CNB from the 1inMM Capital Account 0290 containing investors' funds to his Personal Account 5270 opened for personal expenses. |
| Exhibit 6 | 2013 to 2021 | Flow of funds from Personal Account 5270 back to the business accounts. The accounting shows $90 |

| | | |
|---|---|---|
| | | million in transfers, primarily from the Personal Account 5270 to the 1inMM Capital Account 0290. |
| Exhibit 7 | 2017 to 2019 | An accounting showing JJMT sending $21 million in bundled investor money from Chase Bank directly to Horwitz Personal Account 5270 at CNB instead of to the 1inMM Capital business account 0290. Several transfers are in September and October of 2017 at the same time CNB is investigating the relationship between 1inMM Capital and JJMT. |
| Exhibit 8 | 2013 to 2021 | The LOC accounting. The records show approximately $64 million advanced from LOC Account 9641 to Horwitz's Personal Account (5270), and approximately $63 million transferred back from Horwitz's Personal Account (5270) to the LOC Account 9641 to repay the bank.<br><br>The LOC accounting also shows more than 30 zero-balance events after CNB's October 24, 2017, investigation of the relationship and circular transfers between 1inMM Capital and JMMT Capital. The last $ 1.14 million loan to Horwitz was after the October 9, 2019, recorded zero balance.<br><br>Comparing Exhibit 5 with Exhibit 8, Horwitz received $111 million in 313 transfers through CNB from the 1inMM Capital Account 0290 containing investors' funds to his Personal Account 5270 opened for personal expenses. All of the money used to pay CNB on the LOC in Exhibit 8 came from investors as there was no other source of new funds. |
| Exhibit 9 | 2013 to 2019 | An accounting showing the same-day payments to LOC Account (9641) from Horwitz's Personal Account (5270), occurring simultaneously with transfers of the same or substantially similar amounts from 1inMM Capital Account (0290) to Horwitz's Personal Account (5270). |
| Exhibit 10 | 2015 to 2016 | Examples of CNB's "Not Sufficient Funds" (NSF) warnings to Horwitz and the Bank's review of related accounts to locate funds to cover the |

| | | |
|---|---|---|
| | | deficiencies. More than 100 NSF warnings were issued. |
| Exhibit 11 | 2019 | Two lists of movies purportedly purchased by Horwitz in 2019 to resell the rights to HBO and Netflix |
| Exhibit 12 | 2016 | 2016 examples of City National Bank Transaction Detail Reports for wires into 1inMM Capital account 0290 identifying the movies that investors were told their funds would finance the acquisition of and the resale of distribution rights to HBO, Netflix, and Sony. |
| Exhibit 13 | 2016-01-01 to 30 | January 2016 City National Bank account summary statements for 1inMM Capital account 0290 and Horwitz Personal account 5270 showing circular flow of money and no payments to HBO or Netflix. Includes TDR prepared by CNB for wires in and wires out of the 1inMM Capital account. |
| Exhibit 14 | April 2017 to 2019 | Plaintiff Robert Heney's net-loser claim calculation and the names of the movies in which he purportedly invested. |
| Exhibit 15 | 2019 | In *Evans v. ZB, N.A.*, 779 F. App'x 443 (9th Cir. 2019), the Ninth Circuit held that allegations arising from a bank's lending relationship, including repeated extensions of credit, monitoring of the borrower's financial condition, continued lending despite repeated defaults, and other atypical banking practices—could support an inference that the bank had actual knowledge of its customers' Ponzi scheme. |
| Exhibit 16 | 2019 | In *Evans v. ZB, N.A.*, 2019 U.S. Dist. LEXIS 218432 (2019), a Ponzi scheme case with Net Losers suing the California Bank and Trust, Judge Shubb held that knowledge of the fraud is not the same as knowledge that *the bank itself* committed an independent tort by knowingly assisting the fraud. |

| | | |
|---|---|---|
| | | The Court held that the statute of limitations does not begin to run against the Net Losers and in favor of the bank merely because investors learn of the Ponzi scheme or suffer losses. Under California's discovery rule, the relevant question is when the Net Losers discovered, or reasonably should have discovered, the facts constituting the bank's own wrongful conduct**.** |
| Exhibit 17 | 2017-07-06 | In *Nairn v. City National Bank* (July 6, 2017), the court entered a $395,000 anti-SLAPP sanctions order against the net losers in favor of City National Bank after they had alleged that the bank had knowledge of an ATM Ponzi scheme based solely on the bank's purported duty to investigate its customers under the Bank Secrecy Act. |
| Exhibit 18 | 2021-07-23 | A Notice of Voluntary Dismissal of claims against Defendant City National Bank filed on July 23, 2021, by the Whitmore Net Loser Plaintiffs who were injured in the Horwitz Ponzi scheme. Also included are the: Joint Rule 26(f) Report filed on September 3, 2021; Plaintiffs' Supplement to Joint Rule 26(f) Report filed on January 12, 2022; Plaintiffs' Second Supplement to Joint Rule 26(f) Report filed on March 1, 2022; and the Notice of Voluntary Dismissal without prejudice against defendants Zachary Horwitz and 1inMM Capital LLC, filed on June 30, 2022.<br><br>The case is *Whitmore, et. al. v. Horwitz et.al.* case 2:21-cv-03393-CAS. Whitmore alleged knowledge of the Ponzi by CNB based on BSA reporting requirements which is not a plausible complaint. Whitmore attempted third party discovery against CNB to obtain the necessary facts but had to dismiss the remaining defendants and stop discovery propounded against CNB based on the appointment of Vives as the Receiver. |
| Exhibit 19 | 2021-05-21 | May 21, 2021 Non-party City National Bank's ex parte application for approval to pay off Defendant Horwitz's line of credit and close the account; and a |

| | | |
|---|---|---|
| | | copy of the Order granting City National Bank's ex Parte application. |
| Exhibit 20 | 2015 to 2017 | Checks and a wire transfer from 1inMM Capital LLC to Susan Kozlowski (mother and source of collateral of Zachary Hortwitz), totaling $ 3,960,000. The mother was paid $3,960,000 of stolen money for the $1.14 million in assets she pledged as collateral security that Horwitz used to obtain the loans to steal the money he paid his mother. |
| Exhibit 21 | 2013 | 2013 application by Horwitz for a business bank account for 1inMMCapital, a film finance company that had no stated previous income. CNB informed Horwitz in Exhibit 21 that it would have to conduct Enhanced Due Diligence on his account because it was a business handling other people's money. |